**THE BARENDRECHT. THE CATHERINE MORAN. BARENDRECHT S. S. CO., Limited, v. MORAN TOWING & TRANSPORTATION CO.**

**BARENDRECHT S. S. CO., Limited, v. UNITED STATES.**

(District Court, S. D. New York. January 27, 1922.' On Rehearing, February 27, 1922.)

1. **Collision** &⟶35—**Starboard hand rule does not apply, where one vessel is not on steady course.**

The starboard hand rule does not apply, where one of the vessels was not upon a steady course crossing that of the other, but was rounding to toward the anchorage grounds.

2. **Collision** &⟶81—**Tug and tow held at fault for not blowing fog signals.**

On libel for a collision between a government dredge and a steamship in tow of a tug, evidence *held* to show that a dense fog was prevailing

at the time, and that the tug was at fault for failing to sound fog whistles, and the steamship in tow, which had no steam at the time, at fault for failure to require that they be blown.

3. Towage &wsp;4—Licensed master, employed by towing company, held its agent, while piloting steamer.

An employé of a towing company, who held a license as master and pilot, and who had been sent by the towing company to take charge of the navigation of a steamship while she was being towed without steam of her own, was in point of law the agent of the towing company, and not of the steamer, even though he was paid by the agents of the steamer, and the towage contract provided that, where the tugboat captain was employed as pilot on vessels having their own steam, he became the servant of the vessel.

4. United States &wsp;125—Cannot be libeled for tort of vessel.

Suits can be maintained against the United States only where it has consented by act of Congress to be sued, and there is no authority for suits against it in tort for injuries caused by its vessels except by special act, or by general acts of June 17, 1910, § 4 (Comp. St. § 896), and June 24, 1910 (Comp. St. § 652), authorizing adjustment of claims for collision for which vessels of the light house service or of the navy were responsible.

5. United States &wsp;125—Rule cannot authorize cross-libel against United States.

Admiralty rule 53 cannot authorize a cross-libelant to stay the original suit of the United States as libelant until the United States has given security for the cross-libelant's claim, but must be read in connection with the statutes, which do not permit the United States to be sued on such a claim.

On Rehearing.

6. Towage &wsp;15(3)—Steamer in tow held entitled to full damages from towing company for collision with another vessel.

Even though a steamship in tow was at fault for not requiring the tugs to sound fog signals, and therefore liable for damages caused to the colliding vessel, its towage contract makes its liability secondary to that of the tug, and entitles it to recover full damages from the towing company for its own injuries.

In Admiralty. Libels by the Barendrecht Steamship Company, Limited, against the Moran Towing & Transportation, Company, by the United States against the steamship Barendrecht and the steam tug Catherine Moran, and by the Barendrecht Steamship Company, Limited, against the United States. Decree rendered, allowing full damages to the United States, primarily against the Moran Towing & Transportation Company, and secondarily against the steamship Berendrecht, and allowing full damages in favor of the steamship Barendrecht against the Moran Towing & Transportation Company.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (William H. McGrann, of New York City, of counsel), for Barendrecht Co.

Park & Mattison, of New York City (Samuel Park, of New York City, of counsel), for Moran Towing & Transportation Co.

William Hayward, U. S. Atty., of New York City (John Hunter, of New York City, of counsel), for the United States.

WARD, Circuit Judge. March 5, 1920, the steamer Barendrecht, an oil tanker, light and without steam, in tow of the tug Catherine Mo-

ran on a hawser, with the tug Charles McAllister on her starboard and the tug Retriever on her port quarter, was proceeding down Bay Ridge Channel from Morse's dry dock bound to Bayonne, N. J. The tide was the last of the flood, and she was making over the ground not more than 2 miles an hour. At about 8:30 a. m. of the same day the dredge Atlantic, owned by the United States and operated by the War Department, which had been lying on the Bay Ridge anchorage flats, hove up her anchor and proceeded under a starboard helm, with the intention of going up through the Bay Ridge Channel to the North River, at a speed of from 4 to 5 miles an hour. At about 8:40 a. m. the starboard bow of the Atlantic came into collision with the starboard bow of the Barendrecht, her starboard quarter next striking the bow of the Barendrecht a second blow, and scraping along the side, finally striking the Barendrecht's stern. The vessels then separated, each under a starboard helm; the Atlantic going to the anchorage flats and the Barendrecht toward Bay Ridge.

A reference to the pleadings will be helpful to the understanding of the case. March 22, 1920, the Barendrecht Steamship Company, Limited, owner of the steamship Barendrecht, filed its libel against the Moran Towing & Transportation Company, charging that company, among other faults, with having blown no fog signals:

"(8) The Catherine Moran did not sound proper signals in the obscured weather then prevailing."

The answer of the Moran Towing & Transportation Company charged the steamship Barendrecht with no fault, attributed the collision to the fault of the Atlantic, but did not charge her with failure to blow fog signals. March 26 the United States filed its libel against the steamship Barendrecht and the tug Catherine Moran, alleging that, while the Atlantic was herself blowing fog signals, both the steamer and the Catherine Moran were at fault for not doing so. The claim was for some $6,000. The answer of the Moran Company made no charge of fault against the Barendrecht, but attributed the collision to the Atlantic, without charging her with fault for not blowing fog signals. The answer of the owner of the Barendrecht did not charge the Atlantic with failure to blow fog signals, but did charge the Moran Company in the same words as (8) of its original libel. The answer charged the Catherine Moran with no fault at all. The Barendrecht Company also petitioned in the Moran Company and the tugs McAllister and Retriever under the fifty-ninth rule, making no charge against the Atlantic for not blowing fog signals, and making the same charge against the Catherine Moran as in (8) of its original libel.

March 8, 1921, the Barendrecht Company filed a cross-libel against the United States to recover the full amount of its damages, alleged to be some $35,000, praying that the suit of the United States be stayed until it give security to cross-libelant. January 16, 1922, the United States, appearing specially, filed exceptions to the cross-libel on the ground that, the Atlantic being the property of the United States and actually operated by the War Department at the time of the collision, the court was without jurisdiction.

No one has appeared for the tugs McAllister and Retriever, and there is nothing to show that process was ever served upon them.

[1] The tug Catherine Moran first discovered the Atlantic approaching her starboard bow at an angle of several points. The Atlantic was then under a starboard helm, intending, on account of increasing fog, to round to and return to an anchorage on the flats, instead of going up the Bay Ridge Channel to the North River. The Catherine Moran blew her a signal of two blasts, which the Atlantic answered with two. This was the proper course of navigation under the circumstances. The starboard hand rule did not apply, because the Atlantic was not upon a steady course crossing that of the tow, but was rounding to toward the anchorage flats, when the signal of two blasts was exchanged. As the Atlantic was passing the Catherine Moran, she discovered the hawser and for the first time was advised that the tug had a tow. The Barendrecht was then within 300 feet, the length of the towing hawser being from 45 to 50 fathoms. Thereupon the Atlantic blew an alarm, put her helm hard astarboard, her starboard engine full speed ahead, and her port full speed astern. At the same time those on the Barendrecht discovered the Atlantic approaching, as they said, nearly head on. The fact that she was going under a starboard helm at and after the exchange of the signal of two whistles accounts for the different heading which those on the Catherine Moran and on the Barendrecht, respectively, saw, viz. those on the tug seeing her angling and showing her port side, and those on the steamer seeing her nearly head on.

[2] The conduct of the vessels at the time shows conclusively that a dense fog was prevailing. They acted as in an emergency, so that the estimates of witnesses that objects were visible from a quarter to half a mile must be rejected as incredible. The thick weather likewise explains the contradictory statements of the witnesses as to the place of collision. The record of the United States Weather Bureau states that a dense fog prevailed between 8 and 9 a. m., and the observer testified that a dense fog is one which obscures objects distant from 1,000 feet or less. It is conceded that no fog signals were blown either from the Catherine Moran or from the tugs alongside the Barendrecht, and that the Barendrecht, being without steam, could neither use her steam whistle nor her steam steering gear.

[3] I find that the Atlantic was blowing fog signals, and was free from the faults charged against her in the pleadings. The Moran Company had entire charge of the towing of the Barendrecht. One of its employees, a licensed master and pilot of steam vessels, was on the bridge in charge of the navigation. He is called by some of the witnesses a "licensed pilot"; but this merely means that he had a license as master and pilot to navigate steam vessels. The Moran Company sent him and the tugs to move the steamer to Bayonne in accordance with the course of business agreed upon and evidenced in writing, which contained the following provision:

"Where the tugboat captain is employed in a capacity of harbor pilot on vessels having their own steam and propelling power, it is understood and agreed as part of the contract of towage that such tugboat captain is to be-

come servant of vessel and the tugs or their owners are not responsible for his actions nor liable for any damage that may occur."

Capt. Reynolds was not captain of one of the tugboats, but he was sent by the Moran Company with its tugs to carry out its agreement of towage, and even if the agents of the steamer paid him for his services he was acting, in point of law, as the agent of the Moran Company in carrying out the contract of towage. I think that the Moran Company was at fault for the failure to blow fog signals, and that the steamship Barendrecht was also at fault, in that her master on the bridge did not require that fog signals should be blown either by the Catherine Moran or by one of the tugs alongside. The Barendrecht Company, which has charged the Moran Company with fault for not blowing fog signals, can hardly complain of this ruling.

[4] I am of opinion that the exception of the United States to the cross-libel is good. Suits can be maintained against the United States only where it has consented by act of Congress to be sued. Stanley v. Schwalby, 162 U. S. 255, 269, 16 Sup. Ct. 754, 40 L. Ed. 960; United States v. Holland-America Lijn, 254 U. S. 148, 41 Sup. Ct. 72, 65 L. Ed. 193. Mr. Justice Gray said in the first case:

"It is a fundamental principle of public law, affirmed by a long series of decisions of this court, and clearly recognized in its former opinion in this case, that no suit can be maintained against the United States, or against their property, in any court, without express authority of Congress. 147 U. S. 512. See, also, Belknap v. Schild, 161 U. S. 10. The United States, by various acts of Congress, have consented to be sued in their own courts in certain classes of cases; but they have never consented to be sued in the courts of a state in any case. Neither the Secretary of War nor the Attorney General, nor any subordinate of either, has been authorized to waive the exemption of the United States from judicial process, or to submit the United States, or their property, to the jurisdiction of the court in a suit brought against their officers."

No officer or department of the United States can waive this sovereign prerogative. Congress has authorized suits against the United States arising out of contracts upon certain prescribed terms. Judicial Code, § 145 (Comp. St. § 1136). But there is no authority for suits in tort, except by special act or by general acts, such as those of June 17, 1910, § 4 (Comp. St. § 896), and June 24, 1910 (Comp. St. § 652); the first authorizing the Secretary of Commerce and Labor to adjust claims for collision for which vessels of the Lighthouse Service shall be found responsible, and the second, the Secretary of the Navy, in the case of vessels of the Navy, not exceeding in either case $500 in amount.

[5] The Barendrecht Company contends that under admiralty rule 53 it is entitled as cross-libelant to an order staying the original suit of the United States until the United States has given it security for its claim. The claim does certainly arise out of the same transaction, but the admiralty rules must be read in connection with the statutes and the law of the United States. The Supreme Court cannot make rules inconsistent with them. For example, no one could read rule IV, as to attachments in personam, or rule VIII, as to the tackle, etc., of ships sued in rem, or rule IX, as to process in case of seizures, or

rule XI, as to the delivery of vessels seized upon claimant's giving bond, or rule XII, as to suits by materialmen, as applying to the United States and its vessels. Mr. Justice Barbour, in United States v. Knight, 14 Pet. 301, at page 315 (10 L. Ed. 465), said:

"It is first objected that, whatsoever may be the construction of this section, as now governing executions, in case of other parties, yet it does not embrace those issued on judgments rendered in favor of the United States; and this, upon the ground that the United States are never to be considered as embraced in any statute, unless expressly named. The words of this section being 'that writs of execution and other final process, issued on judgments and decrees rendered in any of the courts of the United States,' it is obvious that the language is sufficiently comprehensive to embrace them, unless they are to be excluded by a construction founded upon the principle just stated. In Bac. Abr. tit. 'Prerogative,' 3–5, it is said that the general rule is that, where an act of Parliament is made for the public good, the advancement of religion and justice, and to prevent injury and wrong, the king shall be bound by such act, though not particularly named therein. But where a statute is general, and thereby any prerogative, right, title, or interest is divested or taken from the king, in such case he shall not be bound, unless the statute is made by express words to extend to him. It is a settled principle that the king is not, ordinarily, barred unless named by an act of limitations."

Mr. Justice Clifford, in United States v. Herron, 20 Wall. 251, at page 255 (22 L. Ed. 275), said:

"Where an act of Parliament is made for the public good, as for the advancement of religion and justice, or to prevent injury and wrong, the king is bound by such act, though not particularly named therein; but where a statute is general and thereby any prerogative, right, title, or interest is divested or taken from the king, in such case the king·is not bound, unless the statute is made to extend to him by express words. Acts of Parliament, says Chitty, which would divest or abridge the king of his prerogatives, his interest, or *his remedies*, in the slightest degree, do not in general extend to or bind the king, unless there be express words to that effect. Therefore, says the same learned author, the statutes of limitation, bankruptcy, insolvency, set-off, etc., are irrelevant in the case of the king, nor does the statute of frauds relate to him, which last proposition is doubted by high authority. Exceptions exist to that rule undoubtedly, as where the statute is passed for the general advancement of learning, morality, and justice, or to prevent fraud, injury, and wrong, or where an act of Parliament gives a new estate or right to the king, as in that case it will bind him as to the manner of enjoying or using the estate or right as well as the subject."

If the United States cannot be read into acts of Congress when not expressly mentioned, how can it be read into the rules of the Supreme Court? It cannot be sued in tort without its express consent, and it has not consented to be so sued, and no authority but Congress can give such consent. The construction of rule 53 contended for would enable the Barendrecht Company to maintain a suit against the United States which its laws do not authorize to be maintained. As the Barendrecht Company pleaded no set-off in its answer to the government's libel. I need not inquire whether, under The Siren, 7 Wall. 152, 19 L. Ed. 129, such a set-off would be maintainable.

The cross-libel of the Barendrecht Company against the United States will be dismissed, but without costs, as the United States does not itself pay costs. The United States will recover its damages of the tug Catherine Moran primarily, and any deficiency secondarily

of the steamship Barendrecht, without costs.  The Barendrecht Company will recover half damages of the Moran Company.

A decree may be submitted in accordance with the foregoing.

## On Rehearing.

[6] I granted a rehearing in this case upon the question whether or not the owners of the steamer Barendrecht should have been awarded full damages against the Moran Towing & Transportation Company, instead of half damages, as in the opinion filed.  They should have been awarded full damages; "aliquando dormitat- bonus Homerus."

The United States recovered in full the damages to its dredger Atlantic against the tug Catherine Moran because she did not blow fog signals and against the steamship Barendrecht because her master did not require fog signals to be blown.  The Barendrecht was as much liable for the master's omission to do what he should have done as she would have been for'his doing something which he should not have done.  If the case stopped here the usual decree for half damages should have been given against both vessels; i. e., the damages of the owners of the Catherine Moran to be deducted from the damages of the Barendrecht and the owners of the Catherine Moran to pay one-half the difference to the owners of the Barendrecht.  But because the Moran Company was under contract with the owners of the Barendrecht for her towage the United States was required to collect primarily of the Catherine Moran, and secondarily of the Barendrecht.  The contract relations between those parties, however, in no respect lessened the liability of the vessels for their torts respectively.

Because of the contract relation, the owners of the Barendrecht should have been awarded their full damages against the Moran Towing & Transportation Company.  The fact that their own master did not overrule the towing company's master, who was in charge of the operation, or interfere with his management, constitutes no defense to the towing company against its contract liability, nor any reason why the owners of the Barendrecht should not recover in full of the towing company the damages caused by the negligence of its master.  Therefore the decree will provide that the owners of the Barendrecht recover their full damages against the Moran Towing & Transportation Company.