### THE GLORIA. THE THEKLA. THE F. J. LUCKENBACH. KINGDOM OF NORWAY v. FEDERAL SUGAR REFINING CO.

(District Court, S. D. New York. January 15, 1923.)

1. **Set-off and counterclaim ☞1—Right is not merely procedural, but substantive.**
   The right of set-off and counterclaim has come to be, not merely a procedural, but a substantive, right.

2. **International law ☞10—Right exists in suit by sovereign state.**
   If a sovereign state seeks the assistance of the court, it should be obliged to submit to the jurisdiction of the court in respect of any set-off or counterclaim properly assertable as a defense in a similar suit between private litigants.

3. **International law ☞10—Set-off and counterclaim in suit by sovereign state.**
   If a set-off or counterclaim pleaded in a suit by a sovereign state constitutes a defense, it is the duty of the court to determine its whole nature and extent, even though it involves incidentally a determination that the sovereign state is indebted or obligated to the defendant.

4. **United States ☞130—In suit by United States, decree may be rendered on cross-libel.**
   In a suit in rem for collision by the United States, claimant may maintain a cross-libel, and on a determination that libelant's vessel was solely in fault is entitled to a decree against the United States finding the amount of its damages.

5. **International law ☞10—May be pleaded against foreign state.**
   In an action at law by a foreign sovereign state against an American citizen, defendant may plead any set-off or counterclaim permissible between private litigants under the laws of the state, and the issues so made may be fully determined, even if an affirmative judgment thereon, under New York law, may not be rendered against the foreign state.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit for collision by the United States against the Steamship Gloria with cross-libel. On motion by libelant to dismiss cross-libel. Denied.

In Admiralty. Suit for collision by the Luckenbach Steamship Company and the United States against the bark Thekla, with cross-libel. Decree for claimant on cross-libel.

At Law. Action by the Kingdom of Norway against the Federal Sugar Refining Company. On motion by plaintiff to restrict answer and counterclaim. Denied.

See, also, 267 Fed. 929; 268 Fed. 575.

Case I:

Haight, Sandford & Smith, of New York City (Herbert K. Stockton, of New York City, of counsel), for the Gloria and Aktiebolaget Urania.

William Hayward, U. S. Atty., of New York City (Horace M. Gray, Sp. Asst. U. S. Atty. in Admiralty, of New York City, of counsel), for United States, special claimant of the Freedom.

James W. Ryan and Bigham, Englar & Jones, all of New York City, amici curiæ.

Case II:

William Hayward, U. S. Atty., of New York City (John Hunter, of New York City, of counsel), for libelants.

Haight, Smith, Griffin & Deming, of New York City, for libelants Samuelsen and others.

Case III:

Haight, Smith, Griffin & Deming, of New York (Herbert K. Stockton, of New York City, of counsel), for plaintiff.

Ernest A. Bigelow, of New York City, for defendant.

MACK, Circuit Judge. These three cases involve the question of the existence and extent of the right of cross-libel and counterclaim in legal proceedings instituted by or on behalf of a sovereign state.

*Case I.* The proceedings herein arose from a collision on May 5, 1919, between the Norwegian steamship Gloria and the United States steamship Freedom. The Freedom was the former German steamship Wittekind, which was seized by the United States under the joint resolution of Congress, approved by the President March 12, 1917, and under the executive order of the President, issued pursuant thereto, dated June 30, 1917. At the time of the collision the Freedom was manned by a crew of the United States Navy and was being used solely in the transportation of troops.[1] On May 8, 1919, a libel was filed by

[1] Although the title and possession of the United States were apparently admitted by stipulation, subsequently the point was made, particularly by Mr. James W. Ryan and Messrs. Bigham, Englar & Jones, who asked leave to file a brief as amici curiæ, that the United States was not in lawful possession or ownership, because the seizure by the United States without judicial proceedings was illegal and void. Inasmuch as there is no dispute that the Freedom was actually in the possession of the United States, it has seemed to me unnecessary for the purposes of this cause to consider whether the United States acquired an indefeasible legal title under its seizure.

the United States against the steamship Gloria for damages, alleged to amount to $35,000, and process of arrest was issued. On May 21, 1919, Aktiebolaget Urania filed a claim to the Gloria, and subsequently filed a cross-libel against the Freedom for damages alleged to amount to $75,000. On June 27, 1919, the United States filed a suggestion of want of jurisdiction; whereupon the claimant of the Gloria moved that all proceedings under the libel filed by the United States be stayed until the United States should give security, as was alleged to be required by admiralty rule 53 (267 Fed. xx) to answer the cross-libel. On July 17, 1919, the suggestion of the government and the motion of the claimant came on to be heard by this court, and Judge Learned Hand ordered that the libel and cross-libel be consolidated into one suit, that the government's motion for the dismissal of the cross-libel be denied, and that under rule 53 proceedings under the original libel be stayed until the government should furnish security to answer the cross-libel. It should be noted that Judge Hand expressly held that, although the Freedom was immune from arrest while in the possession of the United States, the cross-libel would none the less be entertained. 267 Fed. 929. The United States thereafter filed a stipulation for value in the sum of $75,000, executed by the Emergency Fleet Corporation. On October 27, 1920, the government obtained an order cancelling this stipulation and substituting in lieu thereof the provisions of the Suits in Admiralty Act of March 9, 1920 (41 Stat. 525). On May 12, 1922, the United States filed a further suggestion of lack of jurisdiction, calling the court's attention to the decision handed down by the Supreme Court on January 3, 1922, in the case of the The Western Maid, 257 U. S. 419, 42 Sup. Ct. 159, 66 L. Ed. 299, and praying that the cross-libel be dismissed. This motion is now to be decided.

*Case II.* This case now comes before the court on a motion for a final decree on the cross-libel, pursuant to the report of the commissioner appointed by the court, in an interlocutory decree to assess the damages sustained by the bark Thekla in collision with the steamship F. J. Luckenbach on February 13, 1918. The steamship F. J. Luckenbach was at the time of the collision owned by the Luckenbach Steamship Company, but was under the so-called bare boat form of requisition charter to the United States, and was manned and operated by naval officers and crew and engaged in the transport service, carrying supplies for the United States Army. The Luckenbach Steamship Company filed a libel against the Thekla on May 13, 1918. The owners of the Thekla thereupon filed a cross-libel against the F. J. Luckenbach, and moved under rule 53 for an order staying proceedings upon the original libel until security for the cross-libel was given. The motion was heard before Judge Hough, who entered an order staying the proceedings until security in the amount of $130,000 to answer the cross-libel should be given. Accordingly a stipulation for value in that amount was executed by the Emergency Fleet Corporation. In May, 1919, on motion of the United States attorney, the United States was made a party libelant in the cause. Answers were filed to the libel and cross-libel, and the cause proceeded to trial before me. The collision was found to be due solely to the fault of the F. J. Luckenbach. The

original libel was therefore dismissed. In respect to the cross-libel, after argument, the court held that the United States had submitted fully to the jurisdiction of the court by filing or causing to be filed the bond required to prevent a stay of all proceedings in the libel suit, to which it had been admitted as a colibelant, and that the cross-libel must be sustained. A reference was ordered to assess the damages. 267 Fed. 929. The case, as stated, is now before the court on motion for final decree on the cross-libel for damages assessed on the reference. Case II appears, therefore, to involve the identical question as case I.

*Case III.* Case III is somewhat different from cases I and II. Case III is a suit at law by the plaintiff, the kingdom of Norway, a sovereign state, for money had and received in the alleged sum of $165,000, on the ground that the defendant has been unjustly enriched by the receipt of money which equitably is alleged to belong to the plaintiff. The complaint may be briefly summarized: The kingdom of Norway had, through its Food Commission, contracted with the defendant, the Federal Sugar Refining Company, to purchase 4,500 tons of refined sugar at $6.60 per hundredweight. Although the plaintiff was in great need of sugar to feed its people, it was prevented from receiving sugar under its contract, by reason of the embargo placed on the export of sugar by the United States government. On account of this embargo it was agreed between the plaintiff and the defendant that the time for the performance of their contract should be extended, and that the price should equal that fixed by the government for the market at the time delivery was actually made. It is alleged that the United States Sugar Equalization Board, Inc., a corporation organized and controlled by the Food Administration of the United States, which owned and held all the capital stock thereof, procured the government of the United States to refuse to license the export of sugar under the plaintiff's contract with the defendant, and that in the meantime the market price as fixed by the government rose to $8.12 per hundredweight. The United States Sugar Equalization Board is alleged to have taken advantage of the necessities of the plaintiff, and to have sold the plaintiff 4,500 tons of refined sugar at $11 per hundredweight, an extortionate price, $2.88 per hundredweight above the price fixed by the government. It is stated that the defendant herein. the Federal Sugar Refining Company, brought suit against the United States Sugar Equalization Board for tortious interference with its contract with the kingdom of Norway, and that on demurrer it was held by this court (Federal Sugar Refining Co. v. U. S. Sugar Equalization Board, 268 Fed. 575) that the complaint stated a good cause of action. Before trial a settlement was effected, and the kingdom of Norway contends that $165,000 collected by the defendant from the Equalization Board represented the money unjustly exacted from the plaintiff by the Equalization Board when it took advantage of the plaintiff's necessities to extort an unfair and improper price for its sugar. It is maintained that the defendant in fact did not suffer the loss or damage for which the compensation was paid, and that the sum of $165,000 collected from the Equalization Board is money had and received to the use of the plaintiff, to which money the plaintiff is equitably entitled.

The defendant has filed a counterclaim, setting up that the plaintiff, the kingdom of Norway, has, without legal excuse, failed to perform its contract for the purchase of 4,500 tons of sugar, whereby the defendant sustained damage in the sum of $219,000, for which judgment is asked. The case is now before the court on the motion of the plaintiff, the kingdom of Norway, to restrict the answer and counterclaim to such matters and to such amount as may properly be pleaded as a set-off to the plaintiff's cause of action. Although counsel for the defendant has contended that under section 266 of the New York Civil Practice Act, printed in the footnote,[2] he is not limited, even in filing a counterclaim against a friendly sovereign state, to a cause of action arising out of the contract or transaction as set forth in the complaint as the foundation of the plaintiff's claim or connected with the subject of the action, still it would seem clear that, if it were necessary that the counterclaim arise out of the same transaction as the original complaint, under a fair and liberal construction of the act, this counterclaim could be regarded as so arising.

The principle of immunity of a sovereign state from suit without its consent has a long history in our law, yet there are many new and unsettled problems in regard to its application in modern law to-day. Precedent and logic, while important, afford no infallible guide to the correct solution of these. All the important interests involved must be carefully weighed and balanced. The Pesaro (D. C.) 277 Fed. 473.

[1] With respect to the specific questions here to be decided, it must be remembered that the law of set-off and counterclaim is of relatively recent development. Recoupment only was known to the common law, and a restricted right of set-off first developed in equity. Even the limited right of set-off, properly so called, was never recognized at common law, but was introduced by the statute of 2 Geo. II, c. 22, § 13, made permanent by the statute of 8 Geo. II, c. 24, §§ 4 and 5. Cf. also earlier St. 4 and 5 Anne, c. 17, authorizing set-off in bankruptcy. The broader right of counterclaim and affirmative relief was an even more modern innovation. The right of counterclaim and set-off having been first introduced as a part of our procedural law, halting recognition is just beginning to be given to the fact that the right as between litigants is something more than a procedural convenience and is really a requirement of substantive justice. That the right of set-off and counterclaim is regarded in our law to-day as affecting, in important aspects, the substantive relations between the parties, is clearly seen in

2 "Sec. 266. *Counterclaim Defined.* A counterclaim, except as otherwise provided by statute, must tend to diminish or defeat the plaintiff's recovery, and must be one of the following causes of action against the plaintiff, or, in a proper case, against the person whom he represents, and in favor of the defendant, or of one or more defendants, between whom and the plaintiff or the plaintiff and another person or persons alleged to be liable a separate judgment may be had in the action:

"1. A cause of action arising out of the contract or transaction set forth in the complaint as the foundation of the plaintiff's claim or connected with the subject of the action;

"2. In an action on contract, any other cause of action on contract existing at the commencement of the action."

the rules as to the assignment of choses in action being subject to existing set-offs or counterclaims. It is interesting to note that in Roman law, too, the right of set-off was at first grudgingly recognized as part of the adjective law and only gradually accepted as a part of the substantive law. Girard, Manuel Élementaire de Droit Romain (4th Ed.) pp. 701–708; Buckland, A Text-Book of Roman Law, pp. 696–700.

If the right of set-off and counterclaim be regarded as a mere matter of procedure, there would seem to be no reason why a right against a sovereign state should be recognized by set-off or counterclaim, which could not be set up in an independent suit. On the other hand, if the right of set-off or counterclaim is to be regarded as affecting the substantive relations between the litigants, the question presented assumes an entirely different aspect. It would be only natural for one to expect, in the development of the law of set-off and counterclaim, to find decisions refusing to recognize anything but a right of recoupment in respect of the transaction in suit in a proceeding begun by a sovereign state. Cf. People v. Dennison, 84 N. Y. 272.

On the other hand, as the right of set-off and counterclaim gradually comes to be regarded as affecting the substantive rights of the litigants, one would expect to find courts reluctant to give judgment in favor of a sovereign state, where judgment would, in the circumstances, be denied a private litigant because of the right of set-off or counterclaim. Once the first hurdle is past, and it is recognized that the defendant in suit brought by a sovereign state is not limited in his defense to strict common-law recoupment, but may assert the broader right of set-off, it may be expected that a modern court of equity, of admiralty, or even of law will be impatient of any restrictions on its jurisdiction to determine judicially all questions involved in the controversy or controversies submitted. While a court may have no power to enforce an affirmative judgment against a sovereign state, still if, as a defense to a suit instituted by a sovereign state, a counterclaim or set-off is asserted, it would seem only proper that the court determine all issues fairly before it, even though it involve a finding that the plaintiff state was indebted to the defendant. A modern court should strive to do complete justice; a partial and incomplete adjudication tends only to protract and complicate litigation to the detriment of all concerned. A partial and incomplete adjudication leaves all parties in grave doubt as to their status and rights, and leads to a multiplicity of suits.

[2, 3] A sovereign state, generally speaking, is not obliged to go into court; but, if it seeks the assistance of the court, it would seem to be in accord with the best principles of modern law that it should be obliged to submit to the jurisdiction of the court in respect of any set-off or counterclaim properly assertable as a defense in a similar suit between private litigants. Although, perhaps, the defendant should not be permitted to assert any counterclaim which would not be, in whole or part, a defense to the action brought by the state, yet, if it is necessary to examine a counterclaim for the purpose of determining whether there is a defense to the original action, it would seem inconsistent with the duty of a court of general jurisdiction to do complete

justice for the court not to determine the whole nature and extent of the counterclaim, even though it involved incidentally a determination that a sovereign state was indebted or obligated to the defendant.

There is no principle of public law exempting a sovereign state from its obligations under the law. It should not be assumed that a state desires to deny or evade its obligations. There may be sound reasons of public policy why a state should be immune from the harassment of litigation in forums and under conditions not agreeable to the state. But, once the state has chosen its forum, there seems little reason in law or policy why it should not be subject to the substantive requirements of law and justice.

It is believed that a careful analysis of the English decisions and the decisions of our Supreme Court justify the views herein expressed. In the case of Duke of Brunswick v. King of Hanover (1844) 6 Beavan, 1, 37, 38, Lord Langdale, the Master of the Rolls, discusses the rights of the defendant against a foreign sovereign who sues in equity in the following terms:

"It has been fully established that a foreign sovereign may sue in this country both at law and in equity, and further that if he sues in a court of equity he submits himself to the jurisdiction of the court. A cross-bill may be filed against him, and he must put in his answer thereto, not by any officer, agent, or substitute, but personally upon his own oath. * * * The cases which we have upon this point go no further than this: That where a foreign sovereign files a bill, or prosecutes an action in this country, he may be made a defendant to a cross-bill or bill of discovery in the nature of a defense to the proceeding, which the foreign sovereign has himself adopted. There is no case to shew that, because he may be plaintiff in the courts of this country for one matter, he may therefore be made defendant in the courts of this country for another and quite a distinct matter; and the question to be now determined is independent of the fact stated at the bar, that the king of Hanover is or was himself plaintiff in a suit for an entirely distinct matter in this court."

In Strousberg v. Republic of Costa Rica, 29 W. R. 125 (1880), a suit was brought against the republic of Costa Rica for the purpose of setting up a claim against a final judgment which had already been recovered by the republic against the plaintiff in an earlier action. The suit was, of course, dismissed on appeal. But in his opinion Jessel, M. R., stated:

"It is an action against a foreign state to make that state pay its debts to the plaintiff. If that be so it may be asked how so learned and experienced a judge as Baron Pollock came to make the order. The answer is not far to seek. He was told, and he seems to have adopted the statement without sufficient knowledge of the prior proceedings, that it was in the nature of a counterclaim or cross-action, and in that case, no doubt, you can make a sovereign state a defendant with a view of doing justice in the original action brought by the sovereign state."

James, L. J., also remarked:

"It is a violation of the respect due to a foreign sovereign or state to issue the process of our courts against such sovereign or state. There is but one exception, if it can be called an exception, to the rule, and that is where a foreign sovereign or state comes into the courts of this country for the purpose of obtaining some remedy; then by way of defense to that proceeding the person sued here may file a cross-claim against that sovereign or state for enabling complete justice to be done between them. The defendant

in that case is, in fact, only giving to the foreign sovereign's attorney or solici-
tor notice of the proceedings—for that is, in substance, what it comes to—so
as to bring in whatever defense or counterclaim there might be as a set-off."

The case of The Newbattle, 10 Prob. Div. 33, 5 Aspinall Maritime
Cases, N. S. 356 (1885), is peculiarly significant. The facts are sub-
stantially similar to those of case I and case II herein under discussion.
The Belgian government libeled a privately owned British vessel for
damages sustained by one of its ships as a result of a collision. The
British owners filed a cross-libel and applied for a stay of the original
proceedings until security was given for the cross-libel. The case was
ably argued on appeal for the Belgian government by such eminent ad-
miralty counsel as Dr. Phillimore and J. P. Aspinall. The Court of
Appeals was unanimous in holding that the original proceedings should
be stayed pending the giving of security to answer the cross-action.
Brett, the Master of the Rolls, stated:

"It seems to me that this case is clearly within the words of the act of
Parliament. What is there to take it out of the section? It is said that this
order ought not to have been made on a sovereign prince. There are some
orders which ought not to be made on a sovereign prince, but there are some
which ought. In the case of The Parlement Helge, ubi supra, the defendant,
who was a sovereign, appeared under protest, and the question there raised
was whether the admiralty court could seize a sovereign's ship carrying the
insignia of sovereignty. It, however, has always been held that, if a sover-
eign comes into an English court as plaintiff, and avails himself of its proce-
dure, the court may make all proper orders against him. How far that will
go I do not know. In this case, the plaintiff having instituted his action in
the English admiralty court, an order that he shall be restrained from pro-
ceeding until he gives security to answer the defendants' counterclaim is not
in my opinion an order which touches his dignity. The court may very well
do that within the comity of nations. The plaintiff has submitted himself to
the jurisdiction of the court by instituting his action, and therefore the
court says, 'We will not exercise our jurisdiction in your favor unless you give
security.' What may be the result as to execution or seizing the ship after-
wards is quite another thing. We, however, do not anticipate that if the
judgment goes against the king of the Belgians he will not pay."

In Imperial Japanese Government v. Peninsular & Oriental Steam
Navigation Co., [1895] App. Cas. 644, it was held, on somewhat sim-
ilar facts, that where the Japanese government sued the Peninsular &
Oriental Steam Navigation Company for collision damage in the Brit-
ish consular court, a counterclaim filed by the respondent for damage
to its steamer could not be entertained as such. Their lordships did
not purport to overrule The Newbattle, but rested their decision on
the limited scope of the jurisdiction of the British consular courts,
which by treaty had jurisdiction only of claims by Japanese against
British subjects, while, by the same treaty, jurisdiction of claims by
British subjects against Japanese was vested solely in the Japanese ter-
ritorial courts.

South African Republic v. La Compagnie Franco-Belge du Chemin
de Fer du Nord, [1897] 2 Ch. Div. 487, and [1898] 1 Ch. Div. 190, are
sometimes loosely cited in support of the proposition that an affirma-
tive judgment cannot be recovered on a counterclaim against a sover-
eign state. The original proceedings were instituted for the appoint-
ment of a new trustee of a trust fund. The defendant, a Belgian cor-

poration, held a railway concession from the plaintiff state. Under the concession the defendant had issued debentures which were guaranteed by the plaintiff. The proceeds of the debentures were to be held by two trustees, one nominated by the plaintiff and one by the defendant. The views which·the plaintiff and defendant took as to the proper application of those funds were widely divergent. The nominee of the South African Republic having died, the Republic sought to have a new trustee appointed and to enjoin the use of the fund in the meanwhile by the defendant. The Belgian corporation put in a statement of defense and counterclaim, in which various breaches of the terms of the concession by the plaintiff government were alleged. The following relief was sought by the counterclaim: (a) Damages for the alleged breaches of the terms of the concession; (b) damages for libel; and (c) an injunction restraining the plaintiff government from taking proceedings in the courts of South Africa for the purpose of having the concession declared void, or in the alternative, damages. In [1897] 2 Ch. Div. 487, the action of the lower court in striking out the counterclaim based on libel was sustained by the Court of Appeals. It was stated that such a counterclaim would not be allowed in a similar proceeding between private litigants, and all the Lord Justices indicated that that was the ground of their decision. Subsequently an application was made in the lower court to strike out the remaining portions of the counterclaim [1898] 1 Ch. Div. 197. North, J., denied the application, saying:

"The great object of the defendants in getting it [the South African Republic] joined in this action is this. In ordinary cases it probably would not matter very much whether they proceeded by counterclaim or cross-action; but if there has to be a cross-action, it cannot be served upon a foreign government in this country. They want to get a counterclaim to enable them to serve it upon the plaintiffs in the action, and so get jurisdiction against them in respect of these matters. * * * The claim, if any, is against the government for particular sums, which would have to be paid by the government out of its general revenues, and for which there is no claim on the fund in question in any way. That being so, I do not see how the claim to recover those sums against the government can be right. * * * It is a pure pecuniary claim against the government, entirely outside of and independent of the subject-matter of the present action. It is not in reality a defense at all to the case set up by the government in that action. Under these circumstances it seems to me that these sums are not sums which can be the subject-matter of counterclaim against the government; in other words, I do not think the government can be sued in respect of these matters by way of counterclaim; but, even if they could, I certainly think that they are so foreign to the subject-matter of the present action that it would not by any means be convenient to unite these matters with the subject-matters of the action at all."

It will be seen that Judge North's opinion does not in reality involve the question of whether an affirmative judgment may be rendered against a sovereign state in respect of a counterclaim which would be a defense in whole or in part to the original proceedings.

In The Tervaete, [1922] Prob. 197, 203, Sir Henry Duke, the President, stated:

"I am not aware of any authority which decides that the acts of foreign sovereigns and their servants are not capable of having jurisdictional effect. Early in the history of English law, as appears from Lord Coke's well-known·

statement in Calvin's Case (1609) 7 Rep. 1, a foreign sovereign was a possible defendant in English courts. A foreign state may acquire property, alienate it, or charge it, and vindicate its rights of property before English tribunals. Such a state, if it takes no objection to the jurisdiction, may be the subject of an adverse judgment in respect of rights it has granted or obligations it has incurred. If a foreign sovereign sues in England, the party sued may enforce rights against the sovereign plaintiff by a counterclaim, and in the determination of their relative rights the acts and omissions of each will, speaking generally, be adjudicated upon in accordance with one set of legal principles equally applicable to each, though when judgment is given no process or execution can issue against the sovereign litigant or his property."

The specific point to be decided in The Tervaete was whether a government-owned vessel, which is not subject to arrest, may, after having been sold into private ownership, be libeled and seized on account of a collision occurring while the vessel was in the service of the government. Although Sir Henry Duke in the lower court reached a decision contrary to that of our Supreme Court in The Western Maid, supra, he was reversed in the Court of Appeals. The Tervaete, [1922] Probate, 259. But it is worthy of note that his statement of the law regarding counterclaims against a sovereign was not even questioned by counsel for the appellants, who in their argument stated:

"The cases in which there have been cross-claims against a foreign sovereign or sovereign states—e. g., The Newbattle—stand in a different category; for if a sovereign sues in a British court he submits himself to the jurisdiction of the court, and the court will naturally see that justice is done. If, therefore, there is a counterclaim or cross-action the court, if necessary, will order the foreign sovereign to give security. The Newbattle."

The justices of the Court of Appeals likewise in their opinions show no disposition to depart from The Newbattle. Banks, L. J., stated (pages 265, 266):

"I think it may be conceded for the purposes of the argument that the fact that a sovereign or a sovereign power cannot be proceeded against in the courts of a foreign country does not exclude all idea of liability for a breach of contract, or for a tort, in the sense that under no circumstances can the sovereign or the sovereign state do wrong. The rule that where a sovereign sues in the courts of this country, proceedings may be taken against him in mitigation of the relief claimed by him, would be of no value except upon the assumption that claims for breaches of contracts, or for torts, might be established and set off in mitigation. * * * In The Newbattle it was assumed that the king of the Belgians might be held liable in damages on the cross-cause for the negligence of those in charge of his vessel. * * * In spite of the fact that I have accepted the arguments of the respondents in support of the President, I am unable to agree with his final conclusion, and I do so upon a point to which his attention does not appear to have been specially directed."

Scrutton, L. J., pointedly observes (page 272):

"I agree that a sovereign may call upon us to enforce legal rights in his favor. The Newbattle shows that, if he does so, we may refuse to enforce those rights unless he allows the legal rights we recognize to be effectively enforced against him."

Atkin, L. J., also remarks (pages 273, 274, 275):

"The acts of a foreign sovereign may constitute breaches of contract or of duty not arising from contract which create rights in the other party. True, such rights may be of little value, as they cannot ordinarily be enforced by

action. But the inability is a mere personal inability to sue; they can be made effective in defense, as, for instance, by set-off where the rights give rise to a power of set-off; * * * and should the sovereign submit to the jurisdiction in respect to a claim based upon such rights, I apprehend that a court would be bound to give effect to them. * * * I only desire to add a word or two on The Newbattle in the Court of Appeal. There the court held that upon the construction of the Admiralty Court Act, 1861, where a foreign government had brought an action in rem against 'the owners of The Newbattle, an order could be made staying the action until security had been given by the plaintiffs to answer the cross-claim of the defendant in respect of the same collision. The relevance of the case is that under this section a condition precedent of such an order is that the plaintiff's ship cannot be arrested, and the decision of the court proceeds on the ground that though the foreign sovereign had invoked the jurisdiction of the court and though he was under possible liability for damages in an effective cross-suit, yet his ship was exempt from arrest."

Most of the early cases in the United States Supreme Court arose in connection with the Act of Congress of March 3, 1797 (1 Stat. 512), which provided, among other things, that, where a suit is instituted against any person indebted to the United States, the court shall on motion grant judgment at the return term, unless the defendant shall in open court, make oath or affirmation that he is equitably entitled to credits, which had been previous to the commencement of the suit, submitted to the consideration of the accounting officer and rejected. Although it may be doubted whether at this early stage anything more than the strict and limited right of recoupment would, in the absence of statute, have been recognized, it was supposed at one time that the statute authorized the court to render an affirmative judgment against the government for any balance found due the defendant, and there were some judgments of the Circuit Courts to that effect. But the Supreme Court drew back from what was apparently regarded at that time as a radical innovation.

In Reeside v. Walker, 11 How. 272, 13 L. Ed. 693, the Circuit Court had rendered an affirmative judgment against the government and the judgment creditor sought to mandamus the Secretary of the Treasury to pay the same. The Supreme Court, denying the mandamus, held, obiter dictum, that an affirmative judgment could not be rendered against the government. No attempt apparently was made by court or counsel to distinguish the rendering of the judgment from its enforcement. In De Groot v. U. S., 5 Wall. 419, 427, 433 (18 L. Ed. 700), in the course of his opinion, Miller, J., stated:

"The government of the United States cannot be sued for a claim or demand against it without its consent. This rule is carried so far by this court, that it has been held that when the United States is plaintiff in one of the federal courts, and the defendant has pleaded a set-off which the acts of Congress have authorized him to rely on, no judgment can be rendered against the government, although it may be judicially ascertained that on striking a balance of just demands the government is indebted to the defendant in an ascertained amount. And if the United States shall sue an individual in any of her courts, and fail to establish a claim, no judgment can be rendered for the costs expended by the defendant in his defense."

In U. S. v. Eckford, 6 Wall, 484, 489, 18 L. Ed. 920, the Court of Claims had considered itself conclusively bound by a judgment rendered by a Circuit Court against the government, in a suit brought

thereon in the Court of Claims. The Supreme Court went much further than was required for the purposes of the decision; in reversing the Court of Claims, Justice Clifford said:

"Extent of the authority conferred by that section is as plain as any grant of power can well be which is conferred in clear and unambiguous language. Claims for credit in suits against persons indebted to the United States, if it appears that the claim had previously been presented to the accounting officers of the treasury for their examination, and had been by them disallowed, in whole or in part, may be admitted upon the trial of the suit, but it can only be admitted as a claim for a credit, and not as a demand for judgment. Such a claim for a credit shall be admitted, and if proved should be allowed in reduction of the alleged indebtedness of the defendant, even to the discharge of the entire claim of the plaintiffs, but there is not a word in the provision conferring any jurisdiction upon the court to determine that the United States is indebted to the defendant for any balance, or to render judgment in his favor for the excess of the set-off over his indebtedness as proved in the trial. * * * Without extending the argument, we adopt the views expressed by this court in the case of De Groot v. United States, decided at the last term, that when the United States is plaintiff and the defendant has pleaded a set-off, which the acts of Congress have authorized him to do, no judgment can be rendered against the government, although it may be judicially ascertained that, on striking a balance of just demands, the government is indebted to the defendant in an ascertained amount."

The next improtant decision is The Siren, 7 Wall. 152, 154, 19 L. Ed. 129. The Siren, while in charge of a prize crew, negligently ran into and sank the sloop Harper. The Siren, having subsequently been condemned as prize, the owners of the Harper asserted a claim for her and her proceeds for the damages sustained by the collision. The claim was allowed by the Supreme Court, and it is interesting to note that, while the court still is inclined to limit the right of affirmative relief against the government, it views the right of counterclaim and set-off against the government, which has asked the aid of the court, as a substantive requirement of equity and justice rather than a statutory privilege. The language of Justice Field is significant in showing the steady development of judicial thought:

"But although direct suits cannot be maintained against the United States, or against their property, yet, when the United States institute a suit, they waive their exemption so far as to allow a presentation by the defendant of set-offs, legal and equitable, to the extent of the demand made or property claimed, and when they proceed in rem, they open to consideration all claims and equities in regard to the property libeled. They then stand in such proceedings, with reference to the rights of defendants or claimants, precisely as private suitors, except that they are exempt from costs and from affirmative relief against them, beyond the demand or property in controversy. In United States v. Ringgold, a claim of the defendant was allowed as a set-off to the demand of the government. 'No direct suit,' said the court, 'can be maintained against the United States. But when an action is brought by the United States to recover moneys in the hands of a party who has a legal claim against them, it would be a very rigid principle to deny to him the right of setting up such claim in a court of justice, and turn him round to an application to Congress.' So in United States v. Macdaniel, 7 Peters, 16, to which reference is made in the case cited, the defendant was allowed to set off against the demand of the government a claim for services as agent for the payment of the navy pension fund, to which the court held he was equitably entitled. The question, said the court, was, whether the defendant should surrender the money which happened to be in his hands, and then petition Congress on the subject; and it was held that the government had no right, legal or equitable, to the money."

In Case v. Terrell, 11 Wall. 199, 20 L. Ed. 134, the Supreme Court set aside an affirmative judgment rendered against the government, but there the government had not been made a party to the suit and had in no manner appeared in the case.

In Lee v. Kaufman, 15 Fed. Cas. 162, 198–199, the Circuit Court, on the basis of the above decisions and on the assumption that no affirmative judgment could be rendered against the government on a counterclaim, discussed the question whether it was proper none the less for the court to ascertain the amount due the citizen. As to this Judge Hughes said:

"Although a moneyed judgment cannot be rendered against the government except where authorized by law, the mere fact that it cannot be, does not of itself suffice to defeat the jurisdiction of a court to ascertain what is due the citizen."

In Schaumborg v. U. S., 103 U. S. 667, 26 L. Ed. 599, the Circuit Court had refused to grant an affirmative judgment against the government, and an appeal was taken to the Supreme Court. While the Supreme Court, relying on its earlier opinions, refused to reverse the lower court, it did indicate that the court might in a proper case permit the jury to certify the balance due from the government. The words of Justice Miller were:

"While sometimes the jury have been permitted to certify to a balance they find to be due from the government in cases of this kind, and under some circumstances it may be proper they should do so, a refusal of the court to direct that it be done cannot be reviewed here."

The Nuestra Senora de Regla, 108 U. S. 92, 2 Sup. Ct. 287, 27 L. Ed. 662, and The Paquete Habana, 189 U. S. 453, 23 Sup. Ct. 593, 47 L. Ed. 900, mark a considerable advance in the views of the court. Both of these were prize cases; both were cases of wrongful seizure by the government. And in both cases the court rendered on the counterclaim filed an affirmative decree in favor of the claimant and against the government as libelant. It may be possible to urge that a peculiar rule obtains in prize cases, but it is difficult to say that the court based its decisions on any such narrow ground. Indeed, in The Paquete Habana, counsel for the claimant, apparently fearing that the court might draw back from the broad ground taken in The Nuestra Senora de Regla, argued that the claim of the owner of the vessel seized was simply for restitution of the property or its cash equivalent. The court did not, however, adopt any restricted theory of this kind. It placed its decisions on the broad principle of modern law that, the government having come into the court, the court would determine all questions necessary for the disposition of the entire controversy. That being the case, the court properly embodied its determinations in the form of a decree. It distinguished, what it had failed to distinguish in the earlier cases, the rendering of an affirmative judgment or decree from its enforcement or execution.

As the advance, which, in my judgment, the decisions in The Nuestra Senora de Regla and The Paquete Habana mark in the law, has not been as widely recognized as might be expected, it seems to be worth while to quote at length passages on which I have relied.

In The Nuestra Senora de Regla, supra, Chief Justice Waite, speaking for the united court, says:

"The first of the remaining questions to be considered is whether a decree can be entered against the United States for damages. As the capture was made by the army, or by the army and navy operating together, it inured exclusively to the benefit of the United States. There is no distribution of prize money in such a case. Porter v. United States, 106 U. S. 607; The Siren, 13 Wall. 389. The United States, were, therefore, in legal effect the captors, and they came voluntarily into court to secure for themselves the benefit of what had been done. They deliberately adopted the acts of the military and naval officers as their own, and came, as captors, to condemn their prize. * * * It is objected, however, that the executive department of the government had no power, in the absence of express legislative authority, to make such a submission. It was the duty of the United States, under the law of nations, to bring all captured vessels into a prize court for adjudication. * * * It is true any judgment that may be rendered [against the United States] cannot be judicially enforced, but the questions to be settled are judicial in their character, and are incidents to the suit which the United States were required to bring to enforce their rights as captors. * * * When, therefore, the United States, through the executive of the nation, waived their right to exemption from suit, and asked the prize court to complete the adjudication of a cause which was rightfully begun in that jurisdiction, we think the government is bound by the submission, and that it is the duty of the court to proceed to the final determination of all the questions legitimately involved. The next inquiry is as to the amount of damages. The duty of a captor is to institute judicial proceedings for the condemnation of his prize without unnecessary delay, and if he fails in this the court may, in case of restitution, decree demurrage against him as damages. This rule is well settled. Slocum v. Mayberry, 2 Wheat. 1; The Apollon, 9 Wheat. 362; The Lively, 1 Gall. 314; The Corier Maritimo, 1 Rob. 287. * * * Our conclusion is that damages should be allowed as follows: For unnecessary and unusual delay in proceeding to adjudication,

175 days at $200............................................. $35,000
For value of vessel...........................................  30,000
                                                               --------
In all .....................................................  $65,000

"To which add interest, at the rate of 6 per cent. per annum from the time of the order of restitution, June 20, 1863, until the decree."

The opinion in The Paquete Habana, supra, was written by Mr. Justice Holmes. The pertinent part of the opinion follows:

"The decree must run against the United States, if a decree is to be made. In The Nuestra Senora de Regla, 108 U. S. 92, 102, the court *was of the opinion that the United States had submitted to the jurisdiction of the court so far as to warrant the ascertainment of damages according to the rules applicable to private persons in like cases.* It seems to us that the facts here are not less strong. Decrees in cases which disclose no special circumstances have been recognized by subsequent statutes providing for their payment. The Glen, Blatchf. Prize Cases, 375, Act of February 13, 1864, c. 10, 13 Stat. 575; Labuan, Blatchf. Prize Cases, 165, Act of July 7, 1870, c. 220, 16 Stat. 649; Sybil, Blatchf. Prize Cases, 615, Act of July 8, 1870, c. 231, 16 Stat. 650; Flying Scud, 6 Wall. 263, Act of July 7, 1870, c. 219, 16 Stat. 649. See, also, 16 Stat. 650, c. 232; Id. 651, c. 234.

There is nothing in the opinion in The Western Maid, supra, which was also written by Mr. Justice Holmes, which limits the rule set forth. The following language in The Western Maid would seem, indeed, to strengthen and corroborate that doctrine:

"Legal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp. The leading authority re-

lied upon is The Siren, 7 Wall. 152, 19 L. Ed. 129. The ground of that decision was that when the United States came into court to enforce a claim it would be assumed to submit to just claims of third persons in respect of the same subject-matter. 7 Wall. 154, 19 L. Ed. 129; Carr v. United States, 98 U. S. 433, 438, 25 L. Ed. 209. In reaching its result the court spoke of such claims as unenforceable liens, but that was little more than a mode of expressing the consent of the sovereign power to see full justice done in such circumstances. It would have been just as effective and more accurate to speak of the claims as ethical only, but recognized in the interest of justice when the sovereign came into court. They were treated in this way by Dr. Lushington in The Athol, 1 Wm. Rob. 374, 382. Further distinctions have been taken that need not be adverted to here. There was nothing decided in Workman v. New York, 179 U. S. 552, 21 Sup. Ct. 212, 45 L. Ed. 314, that is contrary to our conclusion, which, on the other hand is favored by The Fidelity, 16 Blatchf. 569, 573, Fed. Cas. No. 4,758, and In re State of New York, Walsh, Petitioner, 255 U. S. ——, 41 Sup. Ct. 588, 65 L. Ed. ——, June 1, 1921."

Indirect support for the doctrine of The Paquete Habana and The Nuestra Senora de Regla may be found in Richardson v. Fajardo Sugar Co., 241 U. S. 44, 36 Sup. Ct. 476, 60 L. Ed. 879, although this case is, by no means, on all fours.

Nor can the language used by the court in Illinois Central R. R. Co. v. Public Utilities Commission, 245 U. S. 493, 503, 38 Sup. Ct. 170, 62 L. Ed. 425, be taken out of its-context and be said to qualify the doctrine clearly announced by the court in the above cases.

It is true that there have been some federal decisions, which follow the earlier decisions of the Supreme Court, the later decisions apparently having been overlooked by counsel, and in others there are dicta to the same effect. See U. S. v. Nipissing Mines Co., 206 Fed. 431, 124 C. C. A. 313 (C. C. A. 2); Kingdom of Roumania v. Guaranty Trust Co., 250 Fed. 341, 162 C. C. A. 411, Ann. Cas. 1918E, 524 (C. C. A. 2, semble); French Republic v. Inland Navigation Co. (D. C.) 263 Fed. 410; Barendrecht Steamship Co., Ltd., v. U. S. (U. S. Dist. Ct. for S. D. N. Y.) 286 Fed. 386, decided by Judge Ward on January 27, 1922. While there are intimations and dicta in some of the opinions hereinabove cited contrary to the views herein expressed, the actual decisions in those cases which are binding upon this court are, I believe, distinguishable. In the Kingdom of Roumania Case, it was a third party, not the defendant, who asserted the counterclaim; in the Nipissing Case, the construction of the statute in reference to set-offs allowed by accounting officers was involved. It is also true that the decisions in the state courts, taken at large, do not seem as yet to have reached the same stage of development as has been reached in the federal Supreme Court. See cases collected in 33 L. R. A. (N. S.) 376, and in French Republic v. Inland Navigation Co., supra. It is interesting to note, however, the recent tendency away from limiting the set-off or counterclaim to the same transactions. French Republic v. Inland Navigation Co., supra. In New York, however, People v. Dennison, 84 N. Y. 272, so limiting the right of set-off or counterclaim apparently has not been overruled. See Republic of France v. Pittsburgh Steel Export Co., Inc., 112 Misc. Rep. 688, 184 N. Y. Supp. 280. But one might venture the quære whether this narrow rule will prevail under

the new Civil Practice Act, notwithstanding the similarity of its provisions with those of the former Code.

This field of law, it may be noted, seems also to be in a stage of flux and development in continental Europe. There appears to be considerable conflict among the doctrinal writers, and the course of decisions does not seem firmly settled. The German jurisprudence seems to favor the broad right of counterclaim, while the French possibly tends to the more restricted view. See Van Praag, Jurisdiction et Droit International Public, § 105.

[4] Applying the views expressed to the specific cases under consideration, it appears to be clearly right in cases I and II that a cross-libel should lie against the government, and that an affirmative decree may issue thereunder finding the damages. Even if the common-law precedents compelled a different decision in analogous circumstances at law, I should hesitate to extend those precedents to admiralty. Cf. The Pesaro, supra. If the cross-libel were denied in admiralty, unusually complicated problems as to the division of damages and res adjudicata would arise in cases of mutual fault. The question whether rule 53 should be interpreted as applying to the government and requiring it, in order to prevent a stay of the original proceedings, to give security to answer the cross-libel, is not an easy one. On the one hand, it may be urged that the rule is an indirect method of enforcing the execution of a judgment against the government. On the other hand, it may be said that the government need not continue the litigation, and, if it does, it must comply with the rules of the forum. On the whole, I think the decision of the English courts in The Newbattle, supra, correct, and in any event I should not be justified in reversing the considered decisions of Judge Hand and Judge Hough in the earlier stages of the proceedings. In case I, therefore, the motion of the government for the dismissal of the cross-libel will be denied. In case II, a final decree on the cross-libel, finding damages in the amount assessed on the reference, will be granted.

[5] Case III is complicated by the fact that, the proceedings being at law, the procedure should conform with the state practice. The counterclaim filed, however, appears to arise out of the same transaction as the original suit, and would seem, therefore, to be properly entertainable under the state practice. It may be that, under the law of the state of New York an affirmative judgment should not be rendered against the kingdom of Norway, even though the final determination of the controverted issues would justify the same, if the suit were between private litigants. The New York precedents may preclude the rendering of an affirmative judgment, but they do not clearly necessarily preclude a complete determination of the issues raised, short of a judgment. There is, therefore, no necessity at this stage to grant the motion of the kingdom of Norway to restrict the answer and counterclaim to such matters and to such amount as may properly be pleaded as a set-off to the plaintiff's causes of action.

Plaintiff's motion is denied.