## CHAMPLIN REFINING CO. v. GASOLINE PRODUCTS CO.

Circuit Court of Appeals, First Circuit. November 30, 1928.

No. 2285.

Johnson, Circuit Judge, dissenting in part.

William S. Linnell, of Portland, Me., and Horace G. McKeever, of Enid, Okl. (Carl C. Jones, of Portland, Me., Harry O. Glasser, of Enid, Okl., and Emery O. Beane, of Augusta, Me., on the brief), for appellant.

John B. Marsh and Taylor, Blanc, Capron & Marsh, all of New York City (Robert Hale and Verrill, Hale, Booth & Ives, all of Portland, Me., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. As amended, this was a suit at law to recover royalties amounting, with interest, to $103,004.35, admittedly due under a written contract for a nonexclusive license to use the patented Cross cracking process. The defendant (appellant) filed a counterclaim for damages, specified in detail, grounded on an alleged breach of a contemporaneous contract with plain-tiff to construct a plant for, and to use, royalty free, the Cross vapor phase treating system. Evidence was received from defendant in support of this counterclaim; plaintiff offered no evidence in reply.

At the close of the defendant's evidence, the court granted plaintiff's motion:

"That said account in set-off be stricken from the record and that all testimony offered under and in support of said account in set-off be stricken from the record, and for ground of its motion the plaintiff sets forth that the testimony offered under and in support of said account in set-off fails to establish any claim or right of action by the defendant herein against the plaintiff herein."

The main question is whether, interpreting defendant's evidence in the light of the surrounding circumstances in the aspect most favorable to defendant, it was entitled to go to the jury. Union Pacific R. R. v. Huxoll, 245 U. S. 535, 539, 38 S. Ct. 187, 62 L. Ed. 455; Gray v. Davis (C. C. A.) 294 F. 57, 58, and cases cited. This calls for a fairly detailed statement of the situation and the evidence.

Plaintiff is a New York corporation, with its headquarters in New York City. It alleges that it has the right to grant nonexclusive licenses under some 80 named patents, owned by it, by the Texas Company, by the Standard Oil Company of Indiana, by the Standard Oil Company of New Jersey, by the Standard Development Company, and others, as well as under future patents to be hereafter acquired by these oil companies, covering processes and apparatus for treating hydrocarbons. It is a large and responsible concern, carrying on its extensive business in close interrelated affiliation with numerous other corporations.

The defendant is a Maine corporation, producing, refining, and marketing petroleum

products at Enid, Okl., and vicinity; it has a capacity of about 20,000 barrels of crude oil per day, and an investment of several millions of dollars. Its president and chief executive (apparently its founder) is H. H. Champlin, an experienced and competent business man. Prior to 1926, defendant had for some years been operating an oil-skimming plant at Enid, a process under which only part of the gasoline really available in the crude oil is made marketable. "Cracking," and a purifying process to eliminate undesirable odors, colors, and elements, are necessary for full utilization of the real market values in crude oil.

In 1925 and 1926 a number of patented cracking and purifying processes were in general commercial use, and sharply competing for the patronage of such concerns as this defendant. As early as March, 1925, Guy N. Harcourt, of the M. W. Kellogg Company, submitted orally and in writing to Slater, defendant's superintendent, a list of licensees using the Cross cracking process, together with an estimate of the profits obtainable by defendant through using this process. M. W. Kellogg was, as Champlin later testified that he knew, "the erecting company"—that is, the concern that the plaintiff caused to erect plants to use the Cross cracking process under licenses granted by the plaintiff. The Kellogg Company was also, as might be found from a letter written by plaintiff on November 17, 1926, then the plaintiff's "representative in negotiating license agreements and matters in connection with such agreement."

As plaintiff's counsel themselves state in their brief: "Mr. Harcourt continued during 1925 to communicate with the defendant in an effort to interest it in making an installation of Cross cracking units." In a letter to President Champlin dated November 27, 1925, signed, "The M. W. Kellogg Company, by Guy N. Harcourt," Harcourt says:

"I wanted to call your attention particularly to the Barnsdall installation of the Cross process, which they have direct connected to the Gray vapor phase treating towers. They are obtaining 30-plus color directly from the towers. The gasoline passes directly from the cracking plant into the towers and is delivered ready for marketing without any re-running. The Cross process is the only one which can be connected with a vapor phase treating plant in this way."

Harcourt then suggested that Champlin and defendant's superintendent, Slater, see the Barnsdall installation for the Cross cracking process. This Slater did. Slater also made a general study of various competing processes, such as the Dubbs, and Jenkins, and Holmes-Mankey, comparing them with the results achieved by the Cross processes. The general result was a favorable opinion of the Cross processes and devices by both Champlin and Slater.

Again quoting from the plaintiff's brief, which states the fair effect of the parol evidence:

"Harcourt was succeeded by P. C. Keith, Jr., in the negotiations with the defendant and some time in January, 1926, Keith and Charles H. Welling, a vice president of the plaintiff, called on Champlin in Enid, Okl. At this conference the negotiations initiated by Harcourt for the sale of a Cross cracking plant were continued."

Champlin says:

"I was willing to buy. * * * Well, they told me, and Mr. Keith had told me prior to this meeting, that the Cross Development Company had lately developed what they termed a Cross vapor phase treating plant to be used in conjunction with the Cross cracking plant, and that if I would purchase one of their plants and their royalty agreements that they would give me free from royalty this new plant that the Cross Development Company had just patented. They were to install it, and I was to pay for it after it had been in operation successfully. * * * Mr. Keith and Mr. Welling told me that they would give me royalty free a Cross vapor phase treating plant if I would purchase one of their cracking plants and pay for their royalty. That they would install the plant—

"Q. (By the Court): Which?

"A. The Cross vapor phase treating plant, and put it in operation and if it worked successfully why then I should pay for it, without—there was to be no profit in the erection, to them in the erection of the vapor phase treating plant. * * *

"As it passed through the Cross vapor phase treating plant it was to decolorize it and otherwise make it merchantable. * * *

"Well, * * * it was a new process and a great deal cheaper. * * *

"Well, it was to be operated conjointly with the cracking plant and the product was to be finished all at one operation whereas in other processes why the synthetic crude had to be run to stills and vaporized and condensed and then further treated with chlorine gas."

On February 6, 1926, Keith and Harvi-

son, a vice president of the Kellogg Company, took up the negotiations with Champlin, and Champlin says:

"They proposed to sell me the plant and I finally agreed to accept it. * * * They offered to give me the Cross vapor phase treater, Mr. Welling and Mr. Keith, on prior business had offered to give it to me. * * *

"Q. When you use the word 'plant,' will you identify that?

"A. I mean the cracking plant in conjunction with the Cross vapor phase treating plant. * * *

"Well, when they finally left my office they said they would go and prepare contracts, and I should meet them that evening at the Oxford Hotel."

In the evening at the hotel, Champlin, Superintendent Slater, Harvison, and Keith present, Harvison and Keith presented four documents: (a) Draft of the license agreement now sued upon; (b) draft of contract with the Kellogg Company for the erection of the Cross cracking plant, at a cost of over $440,000; (c) contract of guaranty by the plaintiff licensor that the plant thus to be installed would do the work effectively; (d) a document reading as follows:

"Enid, Oklahoma, February 6, 1926.
"Champlin Refining Company, Enid, Oklahoma.
        "Attention Mr. H. H. Champlin.

"Dear Sir: Directed by Mr. C. H. Welling, vice president of the Gasoline Products Company, Inc., we are pleased to outline in this letter their proposition covering the installation of a Cross vapor phase system treating tower.

"The installation is to be made solely at the expense of the Gasoline Products Company, and no moneys are to be paid by the Champlin Refining Company to the Gasoline Products Company until the installation is operating in a satisfactory and feasible manner. The unit shall be said to be satisfactory when the gasoline produced from it has a color, when measured by a standard Saybolt color machine as ordinarily used in the refining industry, of twenty-five (25) or better, is sweet to the "doctor" test as ordinarily understood, passes the copper strip corrosion test, and after eight hours continuous exposure to the sun still has a color of 21 or better.

"When the installation is functioning in a satisfactory manner the Champlin Refining Company is to reimburse the Gasoline Products Company, for the cost only of the installation.

"We are directed to state that the Gasoline Products Company will, in the event that any suits are instituted against the Champlin Refining Company for infringement of patents, undertake and assume the defense thereof, the liability of the Gasoline Products Company, however, being limited to the payment of the court costs as taxed and the compensation and expenses of counsel and experts of its own selection. The Champlin Refining Company shall co-operate fully in the defense of such suits and to that end shall furnish all the evidence in its control. The Champlin Refining Company shall also give the Gasoline Products Company immediate notice of the making of any written claims of infringement.

"We are further directed to state that such an installation is to be royalty free as are any other installations which may be made at the Enid, Oklahoma, refinery of the Champlin Refining Company when said installations are used directly in treating of gasoline produced from the Cross process.

"Cross Engineering Company.

"By P. C. Keith, Jr., Vice President."

We may here conveniently note that the terms of the license contract are, on this record, irrelevant, except, possibly, paragraph 15, on which plaintiff grounds a contention dealt with below; that no question here arises under the guaranty contract; that it is relevant only as it bears on the relation of the various concerns involved in this negotiation and resultant transaction; that the paper copied above is, on its face, but a memorandum of the terms of the oral offer made in January by Welling and Keith for the installation of the Cross treating tower; that the gist of the present case is whether this oral offer was made by plaintiff's agents and was accepted by defendant.

The February 6 interview ended by Champlin's stating that as soon as he had completed his financial arrangements he would accept plaintiff's offer and sign the contracts. They were left with him by Keith. Pursuant to this arrangement, Champlin wired Keith on February 25; and, on February 26, Keith, alone, came to Enid. Champlin then signed the three contracts, and returned them to Keith. One copy of the memorandum supra was kept by Keith; the other by Champlin. Though dated February 26, the written contracts were not in final form delivered until about March 30. Keith had brought them back to Champlin at Enid, on March 20, for his assent to a change made by Welling in the license contract. Work by the Kellogg Company on the plant began

eight or ten days later after March 30. Champlin says: "They did all they could to hurry it up and to hurry up the erection of the Cross cracking plant, but they made no move toward starting the erection of the Cross vapor phase treating plant, and on May 13th I wired:

"Enid Okla 13

"Gasoline Products Co Inc 52 Broadway New York NY

"Wire definite information when we can expect complete plans and specifications of vapor phase treating towers

"Champlin Refg Co."

Plaintiff replied on May 14:

"Champlin Refining Company, Enid, Oklahoma.

"Keith expected here Monday will wire regarding towers after discussion with him.

"Gasoline Products Company."

Parenthetically, evidence and lack of evidence as to the dealings between the parties, particularly during the summer of 1926, must be considered in the light of the undisputed fact that a fire in the defendant's office had destroyed "all or nearly all of our letters and letter-files and records." So that, as Champlin stated, "I am dependent on what * * * the Gasoline Products Company, New York City, were kind enough to furnish us."

A little later Keith visited Enid several times and talked with Champlin about the erection of the towers.

On June 10, an estimate with drawings covering these vapor phase treating towers of the Cross cracking units was submitted in writing on a letterhead as follows:

"Cross Engineering Company (Inc)

"The Engineering Department of the Kansas City Testing

:abpratpru (Inc.)

"Dr. Walter M. Cross    700 Baltimore Ave.,

"Dr. Roy Cross    Telephone Victor 1327

"P. C. Keith Jr.

"Kansas City, Mo., June 10th, 1926.

"Champlin Refining Co. Enid Oklahoma

"Attention: Mr. P. E. Slater."

The estimated cost of these towers, including labor, was $21,502.

On July 12, Champlin telegraphed Welling as follows:

"Enid Okla 12

"C. H. Welling, Vice President Gasoline Products Co Inc 52 Broadway New York NY

"Mr. Keith on his vacation little or no progress being made on the installation of the Cross Vapor Phase Treating Towers stop Kindly insist on prompt action that the towers may be in by the time the cracking plant is completed

"H. H. Champlin

"Received Jul 13 1926 8.56 a. m.

"G. M. P. Murphy & Co."

We find no reply to this telegram.

On July 30, Champlin sent the following telegram:

"C. H. Welling Vice President Gasoline Products Co. Inc 52 Broadway New York N. Y.

"Mr. Keith phones us today nothing done about installation of Vapor Phase Treating Towers stop Cross plant will be ready to try out in fifteen days stop We insist that action be taken at once stop Any delay in starting plant will be expensive.

"H. H. Champlin"

We discover no reply to this telegram.

Again on August 2, defendant wired:

"M. W. Kellogg Co. 16 Dey St. New York N. Y.

"Our Cross cracking plant will be completed within a few days under your contract period nothing is being done toward the installation of the Cross vapor phase treating units period Have wired Mr. Welling but he does not reply period Imperative that something be done that there shall not be any delay in starting plant.

"Champlin Refining Co."

This evoked from Welling a long letter addressed to Champlin, which purports to state much of the history of the dealings between the parties as to the vapor phase treating process. At the trial, Champlin reviewed this letter in detail, and denied the accuracy of many of Welling's statements therein. Which version was correct would of course be for the jury. For present purposes the letter must be treated in the aspect most favorable to the defendant. In it there are references to Keith and the previous dealings between Champlin, Keith, and Welling, confirmatory of other evidence as to their authority to represent the plaintiff. While there is denial that Champlin accepted the offer of the Cross vapor system when the other contracts were made (stated by Welling as February 26, 1926), other parts of the letter are at least consistent with Champlin's testimony that he did accept, and with the other evidence indicating that both parties thereafter understood that the Cross vapor phase treating process fell within the scope of the general acceptance of plaintiff's entire offer by Champlin on February 26.

336

During the next six weeks there were repeated letters and telegrams between the parties, which need not be stated in detail. Champlin adhered to his contention that the plaintiff had made a valid contract with him for the treating towers, and would be liable for the results of failure to have the towers ready to use contemporaneously with the cracking plant. The cracking plant was completed and accepted shortly after the middle of September; but the plaintiff had furnished no treating towers. Thereafter defendant installed its own treating towers, completing them in the following March at a cost of about $30,000, or about $9,000 in excess of the estimated cost of the Cross towers.

■ We think that the evidence, thus sufficiently, although incompletely, outlined (there is much more supporting defendant's position) shows plainly that defendant was entitled to go to the jury under its counterclaim setting up an oral contract with the plaintiff for the Cross vapor phase towers. The real case is a comparatively simple one. It has been unnecessarily confused and complicated, in both courts, by the injection, from both sides, of false and confusing issues. Three written contracts and one oral contract did not, as the defendant contends, make, in technical law, a single contract. The business undertaking—the transaction—was doubtless integral (single), in that the plaintiff and defendant agreed, at one time, on everything involved in installing the necessary apparatus and in granting the necessary rights to use both the Cross cracking process and the Cross vapor phase system. But the cracking plant was to be built by the Kellogg Company, and its effectiveness guaranteed by the plaintiff. While the plaintiff and the defendant were clearly the dominant and controlling parties in the entire transaction, defendant's attempt to make four contracts into one simply tends to confuse the real situation.

On the other hand, there is no merit in the plaintiff's contention of insufficient evidence of agency on the part of Welling, Keith, and the Kellogg Company, to bind the plaintiff to make a contract for the Cross vapor phase towers. It is plain that months of negotiation culminated, in January, 1926, in an offer made by Welling and Keith to Champlin, to crack and purify the defendant's crude oil by the Cross devices for both cracking and purifying. The evidence would fully warrant a jury in finding that, from that time on, that integral offer was the only proposition considered on either side.

The evidence also warrants a finding that on February 6 Champlin committed the defendant to acceptance of the plaintiff's *entire proposition*, conditioned only by his financing; and that this condition was removed on February 26, thus leaving the whole offer accepted. The absence of any discussion of any purifying and deodorizing process or device, other than the Cross vapor phase, from January until about midsummer, tends strongly to support defendant's contention that both parties understood that the acceptance in February involved the entire proposition made to Champlin in January. The conduct and telegrams of both parties in May, when Champlin first complained of delay in starting the treating towers, might well be found to be consistent only with an understanding by both that both were bound, as the defendant claims. Again, in some fashion not very clearly disclosed, tentative steps were taken for the installation of the Cross vapor phase towers during the summer. There was renewed discussion as to the risks of patent litigation, and the operating cost of the Cross system—evidence which would warrant a jury in finding that since the previous January plaintiff had changed its mind as to the efficiency and economy of the Cross vapor phase system, and perhaps as to its legal right to install and use it. Moreover, a jury would be warranted in considering that under this contract practically all the risk accrued to the plaintiff and no reward; that unless the plant, which would cost something over $20,000, was successful, plaintiff would not even be paid for it; that if successful, plaintiff would receive no royalty. The motive to escape from its obligation and perhaps induce the defendant to install a different and royalty producing device not involving danger of patent litigation, is obvious, and might be considered by a jury in interpreting the correspondence and the conduct of the plaintiff's representatives. Champlin testified that in July Keith told him the Kellogg people had arranged to be the selling agents of the Gray people, and tried to persuade him to buy the Gray system subject to a royalty.

■ The memorandum of February 6, quoted above, seems to have confused the parties and their counsel. As already pointed out, it is in nature but a restatement of the offer made by Welling and Keith to Champlin in January. Of course the statements therein are not independent evidence of Keith's agency for the plaintiff. 2 Wigmore, Evidence, § 1018; 1 Mechem, Agency, § 285. But as there is other evidence of

that agency, his acts within the scope of his agency are competent as part of the res gestæ. Attleboro Manufacturing Co. v. Frankfort Ins. Co. (C. C. A.) 240 F. 573, and authorities cited and discussed by Judge Bingham on page 582. Applying the doctrine of that case, the contents of this written memorandum, signed by Keith, become of great significance. He begins the proposal by the phrase:

"Directed by Mr. C. H. Welling, vice president of the Gasoline Products Company, Inc., we are pleased to outline in this letter their proposition covering the installation of a Cross vapor phase system treating tower."

"Their proposition" might well be found by the jury to refer directly to the previous offer made by Welling and Keith to Champlin. The letter proceeds:

"The installation is to be made solely at the expense of the Gasoline Products Company," not at the expense of the Cross Engineering Company. Thus it was, in its financial aspect, entirely a Gasoline Products Company undertaking. And the Gasoline Company, not the Cross Engineering Company, was also to assume the liabilities, that are described in the paper, as to possible patent infringement suits.

■ Why Keith signed as vice president of the Cross Engineering Company does not appear, and is probably immaterial. It may be disregarded as a mere descriptio personæ. At any rate such signature cannot affect defendant's rights to rely on the oral offer then outstanding from the plaintiff, the terms of which were restated in this memorandum, and which oral offer might be found to be accepted when the rest of the general proposition was accepted. But this paper is not a "proposal" from the Cross Engineering Company; it is an "outline" of a "proposition" already made by the Gasoline Products Company.

■ The jury would also be entitled to attach some significance to the fact that plaintiff's agents undertook to prepare and present to Champlin all the written contracts seemingly deemed by them requisite. Keith and Harvison on February 6 at the hotel made the first drafts. Champlin at no time was called on to do anything but to accept, in the various forms presented, the documents they drafted to cover the entire undertaking. Under such circumstances, the jury would be warranted in finding that the fact that Champlin did not demand a formal written contract covering the Cross vapor phase towers was the natural attitude of a busy man dealing with a large and responsible concern, whose agents he regarded as straightforward and trustworthy. Plainly, Champlin was not bound to suspect an attempt to trick his company out of the rights accruing under the offer for the royalty-free, purifying plant, which, in its general nature, involved risk and expense to the plaintiff and no risk or expense to the defendant. The nature of the proposition makes acceptance an easy and natural inference.

■ Another point possibly calls for brief discussion. The defendant's argument that the several contracts were, as matter of law, one, is attempted to be met by the plaintiff by the contention that paragraph 15 of the license contract cuts the defendant off from contending that it relied on any contract outside the terms of the license contract itself. That paragraph reads:

"Fifteenth. The making, execution and delivery of this agreement by the licensee have been induced by no representations, statements, warranties, or agreements other than those herein expressed. This agreement embodies the entire understanding of the parties and there are no further or other agreements or understandings, written or oral, in effect between the parties, relating to the subject matter hereof, except a guarantee of operation contract of even date herewith. This instrument may be amended or modified only by an instrument of equal formality signed by the duly authorized officers of the respective parties."

But as we hold defendant wrong in contending that the various contracts were technically one, it seems hardly necessary to add that we can give no such broad construction to this paragraph as to apply it to matters extrinsic the license contract. This paragraph is intended to buttress rights accruing under the royalty contract—to cut off defenses otherwise open. But no defense to claims under this contract is now made; it is admitted that plaintiff is entitled to recover every dollar it claims. The issue here is solely as to defendant's right to counterclaim for damages suffered under another contract. The fact that this other contract relates to what is, in important aspects, the same transaction, does not extend this fifteenth paragraph to the destruction of that other contract. Its effect is limited to the contract sued upon.

■ Finally, plaintiff's learned counsel argue (rather faintly) that the damages accruing from the breach of the contract as to the Cross vapor phase towers are not "ascertainable by calculation," and therefore not within the scope of R. S. Me., c. 87, § 75. It

is enough to say that, on the pleadings and the evidence, we cannot say that, as matter of law, the damages are not so "ascertainable by calculation."

The evidence indicated that the cracking plant was put in operation and thus became royalty producing to the plaintiff about the middle of September, 1926; that the defendant had no purifying plant until March, 1927, when, at a cost of about $9,000 more than the estimated cost of the Cross towers, it had completed a substitute plant for that process. On this evidence it cannot be assumed that if the plaintiff had installed the Cross system, so as to have the device ready for operation with the Cross cracking plant, it would not have worked according to representations and thus relieved the defendant of large expenses apparently ascertainable by calculation.

The court below was plainly right in denying the plaintiff's motion to strike from the pleadings the defendant's counterclaim or set-off. This ruling, made before evidence offered, was, after the defendant's evidence was received, reversed for some reason not made clear. It is obvious that the issue, even if regarded as doubtful, might well have been submitted to the jury and thus, even as the case then appeared, have saved the new trial which, under our view of the case, is now found necessary.

But it is clear that the defendant's right of counterclaim or set-off is not to be determined on any narrow or technical construction of the Maine statute as to set-off. In Collins v. Campbell, 97 Me. 23, 53 A. 837, 94 Am. St. Rep. 458, the Supreme Court of Maine said, page 25 (53 A. 837) "Originally courts of equity alone had jurisdiction in cases of set-off. * * * The right did not exist at common law until introduced into its practice by statute; but being found conducive to the administration of justice it has been greatly extended by legislative enactments and a liberal construction by the courts. And now courts of common law have an equitable jurisdiction in cases of set-off independent of the statute, practically coextensive with that of courts of equity, and opposite demands arising upon judgments may, upon motion, be set off against each other whenever such set-off is equitable. * * * By the exercise of this equitable jurisdiction the courts are enabled to do justice between the parties in cases not strictly within the provisions of the statute. * * * The criterion by which it is to be determined is whether it is equitable."

And in Crummett v. Littlefield, 98 Me.

317, 320, 56 A. 1053, 1054, the same learned court said: "The equitable right of set-off is not dependent upon the express provisions of statute, but is derived from the rules of the civil law and founded upon principles of natural equity and justice. In applying the doctrine, courts having general equity jurisdiction exercise more extensive powers than those of the common law, and seek to give effect to the rule in all cases where the peculiar equities intervening between the parties clearly require it," citing and reviewing supporting authorities.

Rodick v. Pineo, 120 Me. 160, 166 et seq., 113 A. 45, 49, reasserts the same doctrine of broad and liberal interpretation of the right of set-off, quoting from the language of Mr. Chief Justice Fuller in Scott v. Armstrong, 146 U. S. 499, 507, 13 S. Ct. 148, 150 (36 L. Ed. 1059): "The right to assert set-off at law * * * is of statutory creation, but courts of equity from a very early day were accustomed to grant relief in that regard independently as well as in aid of statutes upon the subject."

Peterson Oven Co. v. Fickett, 121 Me. 413, 417 et seq., 117 A. 575, 578, reiterates the same general doctrine, citing among other authorities an exhaustive opinion by Mr. Chief Justice Peters in Morse v. Moore, 83 Me. 473, 22 A. 362, 13 L. R. A. 224, 23 Am. St. Rep. 783. See, also, The Gloria (D. C.) 286 F. 188, 192, where Circuit Judge Mack deals with the historical development of the doctrine, holding that while originally it was a mere procedural convenience, it has now become "really a requirement of substantive justice."

See also 34 Cyc. 629, 630, 644.

Cf., also, R. S. Me., c. 86, §§ 80, 81, providing that in cross-actions service of writs may be made upon the attorneys of nonresident plaintiffs if the demands are of such a nature that one judgment or execution may be set off against the other. New Haven Copper Co. v. Brown, 46 Me. 418, 421.

Modern authorities are uniform in holding that the doctrine, although of statutory origin, must be given a broad, liberal and equitable construction.

It would be hard to imagine a case presenting a clearer demand for the application of this general doctrine. We have here an Oklahoma business concern, sued by a New York business concern, in the state of Maine, some 1,500 miles away from its real place of business. To deny the defendant a trial, in this suit, of its claim of damages for plaintiff's failure to install the plant of the Cross vapor phase system would amount to

a denial of justice. The defendant's demand grows out of the same general transaction, although the contracts are distinct. If here under cross suits, plainly judgments would be offset. We think the same principle is, on this record, here applicable; and justice demands such procedure, even if the defendant's damages are not technically ascertainable by calculation. This case falls under the doctrines clearly laid down by the Supreme Court of New Hampshire in Johnson v. White Mountain Creamery Ass'n, 68 N. H. 437, 36 A. 13, 73 Am. St. Rep. 610. We find nothing in the decisions of the Supreme Court of Maine inconsistent with the result there reached.

The judgment of the District Court is reversed, the verdict is set aside, and the case is remanded to that court for further proceedings not inconsistent with this opinion; the appellant recovers its costs of appeal.

JOHNSON, Circuit Judge (dissenting). I agree to all of the above opinion, except what is said in the last part in regard to damages to be "ascertained by calculation." As the action is a Maine case, the Maine statute in reference to set-offs is binding upon the District Court of Maine. I think that the damages alleged in the claim of set-off can be "ascertained by calculation" by giving a liberal construction to the Maine statute, but do not agree that the Maine statute can be complied with, if the damages alleged are not capable of ascertainment, and do not agree that the requirement of the statute in regard to damages is technical.