## CARR *v.* UNITED STATES.

1. Where the city of San Francisco, prior to the adoption of the Van Ness ordinance, made a conveyance of certain lots within the city to the United States, and another party sets up a claim to them, under the ordinance, — *Held*, that the conveyance barred the claim.

2. The United States filed a bill to quiet the title to certain lots in its possession in San Francisco; the defendant set up; by way of estoppel, judgments in ejectment rendered by the State courts at the suit of his grantor, against officers of the government then in possession as its agents, in whose behalf the district attorney, and additional counsel employed by the Secretary of the Treasury, appeared. The title was contested on the trial. *Held*, that these facts constitute no estoppel against the government, although, in California, a judgment in ejectment is, in ordinary cases, an estoppel against the tenant in possession, and the landlord who had notice of the suit.

3. The United States cannot be estopped by proceedings against its tenants or agents; nor be sued without its consent, given by act of Congress.

4. Without such an act, no direct proceedings will lie at the suit of an individual against the United States or its property; and its officer cannot waive its privilege in this respect, or lawfully consent that such a suit may be prosecuted so as to bind it.

5. The United States can only hold possession of its property by means of its officers or agents; and to allow them to be dispossessed by suit would enable parties always to compel it to litigate its rights. Therefore, when the pleadings or the proofs disclose that its possession is assailed, the jurisdiction of the court ought to cease.

6. The cases in which public property may be subjected to claims against it are those in which it is, by the act of the government, in juridical possession, or has become so without violating the possession of the government, and the latter seeks the aid of the court to establish or reclaim its rights therein. In such cases it is equitable that the prior rights of others to the same property should be adjudicated and allowed.

7. *The Siren* (7 Wall. 152) and *The Davis* (10 id. 15) cited and approved.

APPEAL from the Circuit Court of the United States for the District of California.

The facts are stated in the opinion of the court.

*Mr. William Matthews* for the appellant.
*Mr. Assistant Attorney-General Smith,* contra.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This case arises upon a bill to quiet title, filed by the United States against the appellant, Carr, and various other persons, upon which a decree was rendered by the court below in favor of

the plaintiff. Carr appealed from this decree. The controversy relates to certain lands at San Francisco, being two lots, each fifty varas square, on Rincon Point, which are claimed by the government as having, with other adjoining lands, been set apart and reserved for public use in 1847, and as having been conveyed to the United States by the city of San Francisco in 1852. The appellant claims the lots in question under one Thomas White, alleging that said White occupied the same in 1849, and that he and his grantees continued to occupy the same until June, 1855, when the Van Ness ordinance was passed.

It is conceded that the premises in question were once pueblo lands, belonging to the municipality of San Francisco; but as such lands, until conveyed to private parties, were subject to the public uses of the government, both before and after the conquest of the country by the United States, it is evident that the latter had the undoubted right to make such appropriation thereof for public use as it might see fit. It is denied, however, that any such appropriation was ever made by the proper authority. It appears from the pleadings and evidence in the case, that from the first occupation of San Francisco by the United States, in 1847, the military authorities of the government set apart Rincon Point (including the premises in question) for the use of the government; but that after the discovery of gold, in 1849, the officers had much ado to keep them clear of trespassers, who entered upon, and endeavored to appropriate the same. In November, 1849, a lease of this tract, with others, was given by the officer in command at San Francisco to one Thomas Shillaber, apparently for the purpose of keeping possession on behalf of the government. This lease was approved by the Secretary of the Interior. About 1852, a marine hospital was built by the government on the southeast half of the block on Rincon Point, bounded by Folsom, Harrison, Spear, and Main Streets. The whole block was 550 feet in length from Harrison to Folsom Street, and 275 feet in width from Main to Spear Street. The southeast half was 275 feet square, forming four lots, each fifty varas, or $137\frac{1}{2}$ feet, square, numbered 1, 2, 3, and 4. Numbers 1 and 2 adjoined Harrison Street, 3 and 4 adjoined 1 and 2. Lots 3 and 4 are the premises in controversy.

The hospital building was actually constructed on lots 1 and 2, standing within four or five feet of lots 3 and 4; and the latter were occupied by buildings or for yard room, as accessory to the hospital.

As before stated, however, different parties attempted to possess themselves of portions of the property; and amongst others, White, under whom the appellant claims, made such an attempt in 1849, in reference to the whole block which includes the lots in question, but was ejected, as appears by the orders and correspondence set out in the complaint.

The consequence of White's attempt was that adverse claims to the property under him were afterwards preferred from time to time. For the purpose of quieting these claims, when the hospital was being erected, a conveyance to the government was procured from the city authorities. On the 10th of December, 1852, the common council of the city passed a resolution that the mayor be directed to convey to the United States all its right, title, and interest to six fifty-vara lots, bounded on the east by Spear Street, on the south by Harrison Street, on the west by Front Street, and on the north by the beach; which description includes the four lots above referred to. Such a conveyance was accordingly made by the mayor, by deed dated the 11th of December, 1852; and from thenceforward the United States claimed the property in question, as well by virtue of the said deed as by right of original appropriation for public uses.

The appellant, as before stated, claims the property by virtue of the Van Ness ordinance, passed June 20, 1855, by which, amongst other things, the city of San Francisco did relinquish and grant all the right and claim of the city to the lands within the corporate limits to the parties in the actual possession thereof, by themselves or tenants, on or before the first day of January, 1855, provided such possession was continued up to the time of the introduction of the ordinance in the common council.

Now, it is too evident to require discussion that the city of San Francisco could not, in 1855, make a valid grant of property which it had already granted in 1852; and which the grantee (in this case the United States) constantly claimed as

part and parcel of premises which were in its undoubted possession. The weight of the evidence in the case is, that the government was in actual possession of lots 3 and 4 as appendant to the hospital, from 1852 to the passage of the ordinance. This would bring it within the terms of the ordinance itself. But we do not deem this material. It had a clear title from the city before, even if the action of the military authorities in 1847 and 1849 was not sufficient to effect an appropriation for public uses.

But the appellant relies on certain judgments rendered in the State courts in actions brought against the agents of the government having possession of the lands in question, which judgments he contends estop the government from claiming any title therein.

The first of these actions was an action for forcible entry and detainer brought in a justice's court in December, 1857, by one Edward Barry against one McDuffie and one Palmer, for ejecting him (Barry) from lot No. 4, which lies on Main Street. The defendants justified under an order of President Pierce, requiring the marshal of the district of California to remove all persons trespassing on said lot. The county court, to which the cause was appealed, found for the plaintiff, and reinstated him in the possession. The only question made in the case was whether the justification was sufficient for ousting a person who was in peaceable possession. This judgment would not have been decisive upon the title, even if the defendants themselves had been the true owners of the land, and had claimed to eject the plaintiff by virtue of said ownership.

The next action was an ejectment brought in the State District Court in February, 1865, by one Wakeman and others (under whom the appellant claims title), against one Hastings and others, to recover possession of the same lot No. 4. The defendants, besides the general issue, pleaded that the premises were the freehold of the United States, and that they, as its officers and employés, and by its authority, entered, &c. The question of title was gone into, and decided against the defendants. A similar action of ejectment was brought in the same court in April, 1865, by one Volney Cushing (under whom the

appellant also claims), against the said Hastings and others, to recover possession of the lot numbered 3, situated on Spear Street. The defendants pleaded the general issue and the Statute of Limitations. The title was also contested in this case, and the judgment was for the plaintiff.

It is proved that the person who was district attorney of the United States for the district of California at the time when said actions were brought and tried, appeared as attorney for the defendants therein; and that Nathaniel Bennett, Esq., attended the trial of one of said causes as counsel for the defendants, being employed and paid by the Secretary of the Treasury of the United States; and, not being able to attend the trial of the other cause, he procured another person to attend in his place.

The appellant contends that this was sufficient to make the United States a virtual party to said actions, and to conclude them by the judgment therein; that by the law of California a judgment in ejectment is an estoppel; and that where a tenant, or other person in privity with the landlord, is sued, and notifies the landlord to defend, the landlord is bound by the judgment pronounced in the action; and to this point the counsel of the appellant cited *Douglas* v. *Fulda*, 45 Cal. 592; *Russell* v. *Mallon*, 38 id. 259; and *Valentine* v. *Mahoney*, 37 id. 389, as well as various cases decided in other States.

Whilst we concede that this may be the law of California as it regards private citizens who are landlords, we are not satisfied that the same law can be applied to the government of the United States. We consider it to be a fundamental principle that the government cannot be sued except by its own consent; and certainly no State can pass a law, which would have any validity, for making the government suable in its courts. It is conceded in *The Siren* (7 Wall. 152) and in *The Davis* (10 id. 15), that without an act of Congress no direct proceeding can be instituted against the government or its property. And in the latter case it is justly observed that " the possession of the government can only exist through its officers; using that phrase in the sense of any person charged on behalf of the government with the control of the property, coupled with actual possession." If a proceeding would lie against the officers as

individuals in the case of a marine hospital, it might be instituted with equal facility and right in reference to a post-office or a custom-house, a prison or a fortification.

In some cases (perhaps it was so in the present case), it might not be apparent until after suit brought that the possession attempted to be assailed was that of the government; but when this is made apparent by the pleadings, or the proofs, the jurisdiction of the court ought to cease. Otherwise, the government could always be compelled to come into court and litigate with private parties in defence of its property.

It may be contended that the United States consented to have its title determined in these cases, and that such consent was manifested by the employment of the district attorney and additional counsel to aid in the defence. But we do not think that any such inference can be legally deduced from the action of the Secretary of the Treasury. He may have deemed it prudent to assist the officers who were sued, without intending to waive any of the rights of the government. And, in fact, he had no authority to waive those rights. In England it is usual, in the admiralty courts, in proceedings *in rem*, when it is made to appear that property of the government ought, in justice, to contribute to a general average, or to salvage, for the proper officer of the government to consent in court that it may take jurisdiction of the matter. As stated by this court in *The Davis* (*supra*), " this consent is given by authority of the king, who thus submits to be sued in his own courts. The liberal exercise of this authority [there] removes the difficulty presented here, where no power to do this exists in any officer of the government, and prevents any apprehension of gross injustice in such cases in England."

The cases like *The Siren* and *The Davis*, already referred to, and many others therein cited, in which the proceeds of government property, incidentally brought into the admiralty, have been subjected to the liens of claimants against the same, stand upon the principle that when the government itself seeks its rights at the hands of the court, equity requires that the rights of other parties interested in the subject-matter should be protected. The " Siren " was brought into the port of Boston as prize, was libelled, condemned, and sold, and the proceeds paid

into court.   In distributing these proceeds amongst those who
had claims against the vessel, an allowance was awarded for
damages to the owner of another vessel which had been sunk by
collision with the " Siren " during her voyage subsequent to the
capture.   It was held that, inasmuch as the United States had
resorted to the aid of the court to procure the condemnation of
the " Siren," and had thus placed her proceeds in the course
of judicial administration, any proper claims against the vessel
itself, prior to that of the government, might well be satisfied
out of such proceeds.   At the same time, it was conceded that
neither the government nor its property can be subjected to
direct legal proceedings without its consent; and that whoso
ever would institute such proceedings must bring his case
within the authority of some act of Congress.   7 Wall. 154.
The " Davis " and her cargo were seized for salvage services.
Part of the cargo was cotton belonging to the United States,
but not in its actual possession, it being in the possession of the
master of the ship under a contract of affreightment.   The
government appeared as claimant; and it was held that the
cotton, like other cargo, was justly liable to pay its proportion
of the salvage services; the court, at the same time, as before
stated, holding that even for salvage services the property of
the government could not be taken out of its own possession
by any direct proceeding.

Without discussing the matter further, we are clearly of
opinion that the judgments in the cases relied on by the appel-
lant constitute no estoppel against the United States.   And
being of opinion that the title of the United States to the
premises in question is undoubted, our conclusion is that the
decree of the Circuit Court must be affirmed; and it is

*So ordered.*