THE SALT RIVER VALLEY WATER USERS' ASSOCIATION, a Corporation, Appellant, v. C. A. SPICER, T. M. OWENS, JOHN H. WATTSON, as Administrator of the Estate of H. A. WATTSON, Deceased, and OCCIDENTAL LIFE INSURANCE COMPANY, a Corporation, Appellees.

1. WATERS AND WATERCOURSES—SECRETARY OF INTERIOR AUTHORIZED TO EXCLUDE LANDS WITHIN RECLAMATION DISTRICT.—Under Reclamation Act, June 17, 1902, section 4 (U. S. Comp. Stats., § 4703), articles of incorporation of Salt River Valley Water Users' Association and its contract with the United States in construction of the Salt River project Secretary of the Interior had authority to exclude lands lying within reclamation district and to cancel stock of owners thereof in the association, on determining that area of lands included in district was greater than could be watered from supply stored and developed by works constructed or to be constructed.

2. WATERS AND WATERCOURSES — SECRETARY OF INTERIOR'S DECISION EXCLUDING LANDS WITHIN RECLAMATION DISTRICT HELD VALID.— Secretary of the Interior's approval of survey board's exclusion of certain lands within Salt River reclamation district, whose owners had subscribed for stock in association, formed to cooperate with United States in construction of the project, and who had paid all assessments levied until their lands were excluded, after determining that area of land included in district was greater than could be watered from supply stored and de-

veloped by works then constructed or to be constructed, *held* valid, since, under association's articles of incorporation and its contract with United States government discretion of Secretary in excluding land was to be based on water to be impounded and raised by works specifically built or definitely determined to be built at time of his action.

3. WATERS AND WATERCOURSES—DETERMINATION OF SECRETARY OF INTERIOR, IN EXCLUDING LANDS WITHIN RECLAMATION DISTRICT, HELD NOT SUBJECT TO REVIEW.—Determination of the Secretary of the Interior, in approving survey board's exclusion of certain lands
 • within Salt River reclamation district, after determining that area of land included in district was greater than could be watered from supply stored and developed by works constructed or to be constructed, was not a ministerial act, but exercise of discretion, and not subject to review by the courts.

See (1) 40 **Cyc.**, p. 815 (1926 Anno.).    (2) 40 **Cyc.**, p. 815 (1926 Anno.).    (3) 40 **Cyc.**, p. 815 (1926 Anno.).

APPEAL from a judgment of the Superior Court of the County of Maricopa. F. H. Lyman, Judge. Judgment reversed and cause remanded.

Messrs. Kibbey, Bennett, Gust & Smith, for Appellant.

Mr. Richard E. Sloan, Mr. C. R. Holton, and Mr. E. G. Scott, for Appellees.

LOCKWOOD, J.—This case is an attempt by certain owners of land situated in the Salt River Valley, to compel the extension to such land of all the rights and benefits of what is commonly called the Salt River reclamation project. There have been four previous actions of a like nature, but this is the first in which it has been necessary for us to pass on the issues raised herein. Though the amount of land concerned in this suit is small, yet the principle at issue is of considerable importance to the Salt River Valley and to similar projects under the Reclamation Act (U. S. Comp. Stats., §§ 4700–4708), involving as it does the respective rights and duties of the federal

government and many local associations formed in furtherance of the act.

The Reclamation Act was passed June 17, 1902. In February, 1903, the Salt River Valley Water Users' Association, hereinafter called the Association, was incorporated under the laws of Arizona, for the purpose of co-operating with the United States in the construction of the Salt River project. The qualifications for membership in the Association were fixed by sections 2 and 3, article V, of the articles of incorporation, which read as follows:

"Section 2. Those and those only who are owners of lands, or occupants of public lands having initiated a right to acquire the same, within the territory described in article IV of these articles of incorporation, or within such extension thereof as may be hereafter made from time to time under the powers herein conferred for that purpose, shall be the holders or owners of shares of the capital stock of this Association. For each acre of such land shareholders may become the owner of one share of stock of this Association and no more.

"Section 3. As a condition of continued ownership of said shares of stock, and of participation in any of the benefits thereof, each subscriber thereof, or transferee thereof in case of transfer, shall, as soon as the right or rights hereinafter referred to become subject to application and acquisition, under the rules and regulations prescribed or to be prescribed for the purpose by Congress or any executive department of the government, apply for, and in good faith, comply promptly with all such rules and regulations for the acquisition of, a right to the use of water from any source of supply provided by the government, or in the provision of which the government has aided for the irrigation of the lands to which said shares and rights represented thereby are appurtenant. Upon the failure of the subscriber, or holder otherwise, of any of the shares of the capital stock of this Association to apply for such rights, or, having applied therefor, upon failure to promptly and in good faith com-

ply with all rules and regulations prescribed, or that may be prescribed by Congress or by any executive department of the government relative thereto, then he shall forfeit to the association such shares of stock and all and every right in anywise theretofore or then incident thereto . . . and such person, his heirs and assigns, shall thereafter have no right whatsoever as a member of this Association by virtue thereof.''

The territory within which the lands to be irrigated must be located was set forth in article IV, above referred to, and was generally called the Salt River reservoir district. Among the rights of stockholders were those set forth in sections 5 and 6 of article V as follows:

''Section 5. The ownership of each share of stock of this Association shall carry, as incident thereto, a right to have delivered to the owner thereof water, by the Association for the irrigation of the lands to which such share is appurtenant.

''Section 6. The amount of water so to be delivered to such owner shall be that proportionate part of all stored and developed water . . . as the number of shares owned by him shall bear to the whole number of valid and subsisting shares of the Association issued and then outstanding, to be delivered to and upon said lands at such times during such season as he may direct.''

It was provided, however, that certain shares of stock should be canceled under the circumstances set forth in sections 12 and 13 of article V, reading as follows:

''Section 12. If it should be determined by the government that the amount of water that may safely be estimated to be capable of being stored, or developed by works acquired or constructed or to be acquired or constructed by it, or by this Association, in addition to the amount of water now appropriated out of the Salt river and Verde river, for the irrigation of lands in said reservoir district, shall to-

gether be insufficient to properly irrigate 250,000 acres of land, then the number of shares of the capital stock of this Association shall be reduced so that the number of such shares shall not exceed the number of acres estimated by the government to be capable of irrigation from such combined sources of supply.

"Section 13. If at the time of determination by the government of the number of acres capable of such irrigation, there shall have been subscribed for a number of shares equal to the number of acres so estimated to be capable of irrigation, then no subscription for more shares shall be taken. If the number so subscribed for, however, shall then exceed the estimated number of acres so capable of irrigation, then there shall be allotted to said subscribers that number of shares equal to the estimated number of acres capable of irrigation. In such allotment, cultivated lands shall have the preference; and any excess in the number of shares subscribed for over the number so allotted, shall be canceled, and thereafter shall not be issued."

The Association and the United States entered into a contract on June 25, 1904. This contract, after reciting the incorporation of the Association and the contemplated construction of the Roosevelt reservoir, and that "whereas, the incorporators of said Salt River Valley Water Users' Association and its shareholders are, and, under the provisions of its articles of incorporation must be, owners or occupants of land and the appropriators of water from said Salt river and said Verde river and their respective tributaries for the irrigation thereof, and in addition thereto . . . must initiate rights to the use of water from the said proposed irrigation works, to be constructed by said Secretary of the Interior, as soon as such rights may be initiated, and thereafter complete the acquisition thereof in the manner and upon the terms and conditions to be prescribed by the Secretary of the Interior, which rights shall be, and thereafter continue

to be forever appurtenant to designated lands owned by such shareholders and constituent members,'' determines what rules are to be used in determining the aggregate amount of rights to be issued as follows:

''That the aggregate amount of such rights to be issued shall in no event exceed the number of acres of land capable of irrigation by the total amount of water available for the purpose, being: (1) The amount now appropriated by the shareholders of the Association; (2) the amount to be impounded and developed in excess of the water now appropriated. The Secretary of the Interior shall determine the number of acres so capable of irrigation as aforesaid, his determination to be made upon due and expert consideration of all available data, and to be based upon and measured and limited by the beneficial use of water, . . . It is understood that in all the relations between the government and this Association and the members of the Association, the rights of the members of the Association are to be defined and determined and enjoyed by and under the provisions of the said act of Congress and of other acts of Congress on the subject of the acquisition and enjoyment of the rights to use water, and by the laws of Arizona where not inconsistent therewith, where such rights have vested, modified, if modified at all, by the provisions of the articles of incorporation of said Association.''

On August 21, 1913, the Secretary of the Interior determined that the area of lands included in the district was greater than could be watered from the supply stored and developed by the works then constructed or to be constructed by the United States and the Association, and suggested the appointment of a board of survey to determine and select the lands which should be retained in the project and those which should be excluded from it. Such a board was duly appointed, and after long and careful investigation it made the finding that there was being de-

veloped a water supply for a maximum area of approximately 195,000 acres, and recommended which specific lands should be retained and which should be excluded, which report was finally approved by the Secretary of the Interior. Among the lands excluded were those now concerned in this action. In 1916 a new survey board reported that by certain other irrigation works in addition to those then existing, or whose construction was definitely determined on, an additional supply of water might be obtained, but no action was taken on this report, affecting the lands of appellees.

On January 18th, 1917, the Secretary of the Interior, in pursuance of section 4 of the Reclamation Act (U. S. Comp. Stats., § 4703), gave notice of the land for which water would be furnished from the Salt River project, showing the filing of the farm units plat and designating the particular land to be supplied. The lands involved in this suit were not included in such plat.

It has been held by the Supreme Court of the United States, in *Yuma County Water Users' Association* v. *Schlecht,* 262 U. S. 138, 67 L. Ed. 909, 43 Sup. Ct. Rep. 498, that the final determination settling the charges per acre, which necessarily required the determination of the land embraced in the project, can only be made by the formal notice required by section 4 of the act, and such as was given by the notice above referred to.

Up to September, 1917, the reclamation service had entire charge of the care, operation, and maintenance of the project, but at that time the Association and the United States entered into an agreement, whereby the former took over the project, so far as its operation and maintenance was concerned. The title to the entire project, however, was still expressly reserved by act of Congress in the United States, the Secretary

of the Interior was given the right to terminate the contract upon certain contingencies expressed therein, and nowhere was there any authority granted to the Association to increase the area of land served without the consent of the Secretary. Shortly after this last-mentioned contract, however, the owners of various lands which had been excluded from the project under the direction of the Secretary, brought suit to establish their rights therein. The theory upon which all of these cases were brought and decided was practically the same, and the trial court held, adopting such theory, that upon the showing: First, that the land in question was located within the original boundaries of the project; second, that its owner had subscribed to the stock of the Association as provided by its charter; and third, that there was sufficient stored and developed water, in the opinion of the court, including both that developed by the Association on its own account and that developed by the National government, to supply all the lands owned by the shareholders of the Association, including the land in question, that the owner was entitled to all the rights of any other shareholder, including that of his *pro rata* share of the waters stored under the Salt River project.

There have been four suits of this nature prior to the one at bar and in which the ruling was the same. Two were appealed to this court, but before they came on for hearing the lands therein involved, together with those in the other two cases not appealed, were included by the Secretary of the Interior in the project and the appeals were dismissed. The present case followed the lines of the others in the trial court, but this appeal has been carried on to final issue. It is not disputed herein that the lands in question are within the original boundaries of the Salt River project; that their owners subscribed for stock in the

Association and paid all assessments levied until the lands were excluded by the order of the Secretary; and that the order excluding has never been revoked by him, so the issues are purely ones of law.

There have been a number of assignments of error, but there is but one vital issue therein, determination of which will dispose of the case: Was the decision of the Secretary of the Interior excluding the lands valid, and is it binding until revoked by him? It cannot be disputed that any cancellaton of stock in the Association properly subscribed for, so far as this case is concerned, could be made only by the United States. Section 12, article 5, of the articles of incorporation reads, "if it should be determined by the government" which, of course, can refer only to the government of the United States, and the contract of 1904 recognized that all shareholders in the Association must acquire rights in the project "in the manner and on the terms and conditions to be prescribed by the Secretary of the Interior," which rights shall not exceed "the number of acres of land capable of irrigation by the total amount of water available. . . . The Secretary of the Interior shall determine the number of acres so capable of such irrigation as aforesaid." Indeed, the language so repeatedly used is so plain that appellees do not deny that any exclusion must be made by the Secretary of the Interior, but contend that no such exclusion has been legally made. Their argument is based upon the following language of section 12, article 5, *supra:*

"If it should be determined by the government that the amount of water that may safely be estimated to be capable of being stored or developed by works acquired or constructed or to be acquired or constructed by it or this Association . . . shall be insufficient. . . . "

Appellees contend that, to use their own language, "so long as a possible source of supply remains to be

developed'' the number of shares cannot be reduced. According to this view, though the actual development may not be contemplated within the lifetime of any present shareholder, and though economically it may be as infeasible as the suggestion of a student of chemistry that carbon dioxide should be made by burning a diamond in oxygen gas, yet as long as a theoretically possible supply remains which might sometime be developed, the Secretary of the Interior has no power to reduce the number of acres to be irrigated below the 250,000 set forth in the articles of incorporation, and all the original subscribers are equally entitled to water, and in case of a shortage must prorate the available supply.

We cannot conceive such to be the meaning of the language of section 12, even if we were not to construe it in the light of the wording of the contract of 1904. The "amount of water that may be safely estimated" was by the very nature of the section limited to "works acquired and constructed or to be acquired and constructed," which to the ordinary man would certainly refer to work actually done or agreed to be done, and not to that for the accomplishment of which there existed merely a pious hope. Any other construction would be an absurdity. It was well known at the time the Association was incorporated that the possible theoretical development of the storage capacities of the Salt and Verde Rivers, together with the supply which could be obtained from possible future pumping plants, was far in excess of enough to care for the entire 250,000 acres to which the Association was limited. If appellees' construction is to be placed upon section 12, as interpreted in the light of the contract of 1904, which last refers to the amount "to be" impounded and developed, the contingency which was so carefully guarded against, of there not being water enough for

28 Ariz.—20

the 250,000 acres, could never happen, to the common knowledge not only of the reclamation service, under whose advice the Secretary of the Interior acted, but that of almost every man who had given a cursory study to the situation, and the parties were, with full consciousness of that fact, merely perpetrating a solemn farce, when they provided so carefully for the possible cancellation of some of the stock. We conclude that under the articles of incorporation and the contract of 1904 the discretion of the Secretary in excluding land was to be based on water to be impounded and raised by works specifically built or definitely determined to be built at the time of his action, and that his approval of the exclusion recommended by the survey board of 1914 was fully authorized.

But it is contended that circumstances have changed since the exclusion, and since, as plaintiffs claim, such exclusion was merely temporary, and the court has found there is now an abundance of water, they should be restored to their rights. The answer to this proposition is that under the articles of incorporation and the contract of 1904 the exclusion of land does not merely suspend the rights of the shareholders, but the stock ''shall be canceled and thereafter shall not be issued.'' Further, the determination of the Secretary in a matter of this kind was not merely ministerial, but he was acting in the highest degree in the use of discretion, so much so that he was expressly required to use ''due and expert consideration of all available data'' in determining the amount of available water and the lands to be excluded. In such a case certainly a court may not substitute its judgment on those points for that of the Secretary, but his decision as to available water, and land to be included in the project, stands until he modifies it himself.

It is argued that the Association owes a duty to its shareholders to persuade the Secretary to include their lands also within the project, and that there is no question but that he would act upon its recommendation. Waiving for the moment the very obvious reply that since the cancellation of their stock they are no longer shareholders, and the further duty which it is apparent the Association may owe in protecting the rights of its shareholders who have already been awarded the use of water, this is not a suit to compel the exercise of such persuasive powers, but to make the Association do what it has no right to do; viz., to deliver water from the Roosevelt reservoir to lands which the only proper authority has refused to allow such water to.

The whole history of the Salt River project shows very clearly that all the parties thereto, including the government of the United States, without whose aid it never could have been carried to completion, realized the constant and natural tendency of local landholders to increase the lands under cultivation to the utmost for which water could be supplied during the years of plenty, without regard to what might be the situation during the inevitable period of scarcity and the language of the articles of incorporation and the contract of 1904 are proof that, recognizing such facts, the parties desired to limit the amount of land to be irrigated by the project, and, for reasons sufficient to themselves, determined that such right of limitation should be vested in the federal government, acting through the Secretary of the Interior. The necessity and the wisdom of such limitations are obvious at the present time to all of us who reside in the Salt River Valley, when we see staring us in the face the danger of that very shortage feared by those who established the project, and when the Association is expending large sums of money in an endeavor to

avert the consequences of that possible shortage. We realize fully the needs of plaintiffs and sympathize with them in their efforts to make their property of some value, but the proper authorities in establishing the project have laid down the rules which govern it, and we can but declare those rules.

For the foregoing reasons, the judgment of the superior court of Maricopa county is reversed, and the case remanded for proceedings not inconsistent with this opinion.

McALISTER, C. J., and ROSS, J., concur.