. 416 P.2d 187

**CITY OF MESA, a municipal corporation, Appellant,**

v.

**SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DIS-TRICT, an agricultural improvement district, Appellee.**

**No. 8200.**

Supreme Court of Arizona.

In Banc.

July 1, 1966.

Rehearing Denied Sept. 20, 1966.

J. LaMar Shelley, Mesa, for appellant.

Jennings, Strouss, Salmon & Trask, Irving A. Jennings, Phoenix, for appellee.

Ramsey Clark, Asst. Atty. Gen., Charles A. Muecke, U. S. Atty., Arthur E. Ross, Asst. U. S. Atty., Phoenix, Roger P. Marquis, Atty., Dept. of Justice, Washington D. C., amici curiae United States of America.

McFARLAND, Justice.

The City of Mesa, a municipal corporation, the appellant—hereinafter designated the plaintiff—brought an action in eminent domain to condemn a portion of the electrical plant and system of the Salt River Project Agricultural Improvement and

Power District, an agricultural improvement district—hereinafter designated the defendant—located at the Bayless Shopping Center on East Main Street in Mesa, Arizona.

Defendant filed a motion to dismiss the action on the ground that the United States of America is an indispensable party to the action, and therefore the court lacks jurisdiction. The United States of America filed an amicus curiae brief claiming the United States government was an indispensable party to the suit in that the property sought to be condemned is an integral part of an important vital federal reclamation project.

The lower court entered the following judgment October 15, 1963:

"It is the opinion of this Court that the U.S. of America is an indispensable party in this action, and that therefore this Court lacks jurisdiction over the action. "IT IS HEREBY ORDERED that the Complaint herein be dismissed and that each party shall bear their own costs."

From this judgment plaintiff appealed.

In City of Mesa v. Salt River Project Agricultural Improvement and Power District, 92 Ariz. 91, 373 P.2d 722, plaintiff brought an action against defendant for a declaratory judgment to determine the respective rights of the parties to serve electrical energy in certain areas within its corporate limits, including the Bayless Shopping Center. It is the contention of plaintiff that in this decision this court gave plaintiff the right to condemn the property involved in this action.

This court has had occasion to set forth the history of the Salt River Valley Project and the Salt River Valley Project Agricultural Improvement and Power District in other cases [1], the latest being Uhlmann v. Wren, 97 Ariz. 366, 401 P.2d 113. A large portion of the Salt River Valley was irrigated and cultivated in prehistoric times, but had been largely abandoned when white settlers began to arrive about 1867. Adjacent to what is now the Salt River Project were found the Mohave, Apache, Pima, and Maricopa Indians. While their reservations covered many thousands of acres, the irrigated lands consisted of only 4,713 acres, which lay along and close to the Salt and Verde Rivers.

When the white settlers came, they found it desirable and necessary to form canal companies. They soon found, however, that the flow of the river varied, and that during the years of drought the supply of water at low-river stages was inadequate for the land they had placed in cultivation. Maintenance of the brush and rock diversion dams became a problem, for such dams were often washed out at the beginning of the flood. It was soon determined that a permanent dam, or dams, and a canal system were needed. Private capital was not available, so, in order to accomplish their objectives, when the Reclamation Act of June 17, 1902, 32 Statute 388, known as the Reclamation Act, now codified as 43 U.S.C.A. §. 371 et seq., became effective, application was made for a federal reclamation project under the Act.[2]

The Salt River Valley Water Users Association was incorporated under the laws of Arizona February 9, 1903, and a written agreement for the construction of the Project was entered into on June 25, 1904, between the Association and the United States of America. Title to Project property, under the authority of the Reclamation Act was retained in the United States government. The agreement was signed by the Secretary of the Interior on behalf of the United States, and by the Association presi-

1. City of Mesa v. Salt River Project Agricultural Improvement and Power District, 92 Ariz. 91, 373 P.2d 722; Reichenberger v. Salt River Project Agricultural Improvement and Power District, 50 Ariz. 144, 70 P.2d 452; The Salt River Valley Water Users' Association v. Spicer, 28 Ariz. 296, 236 P. 728; Orme v. Salt River Valley Water Users' Association, 25 Ariz. 324, 217 P. 935.

2. The Salt River Project was the first project organized under the Reclamation Act of 1902.

dent and secretary on behalf of the Association. This agreement resulted in the construction of what is now known as the Theodore Roosevelt Dam, and the Project soon expanded to include the construction of the canal system and the power facilities. By 1907 the United States had purchased the various canals and acquired the distribution system in the Valley. In 1910 a contract was entered into between the Association and the United States for the construction of certain additional canals and electric power plants, the immediate cost to be borne by the Association.

During the entire period prior to 1917 the Project was under the operation and control of the United States Reclamation Service. Although the Roosevelt Dam had not been actually completed until 1911, the first distribution of water stored behind the same was made in 1910.

On September 6, 1917, the Association made a supplemental contract with the United States (by the Secretary of the Interior), in which the United States turned over to the Association the care, operation, and maintenance of the Salt River Project. This included power plants, power houses, and transmission lines as well as all of the irrigation facilities.

In 1937 the Association, by agreement, transferred—subject to the rights of the United States of America—to the District all of its properties, including all water and power rights, franchises and privileges. The agreement recited the various contracts and obligations thereunder between the Association and the United States government in regard to the construction, operation, and maintenance of the Salt River Project, in which the District assumed the obligations thereunder. This contract was approved by the Secretary of the Interior, subject to all of the provisions of the contracts between the United States and the Association in existence as of the date of its approval, and the Salt River Project Agricultural Improvement and Power District ex-

pressly stated approval was made without waiver, modification, or abridgment of any of the terms or provisions of the contracts in existence at the time. Approval further provided that any remedy available to the United States against the Association by virtue of any contracts mentioned would be enforceable against the District.[3]

Both defendant and the United States, in their briefs, contend that the United States government is the owner of the project facilities sought to be condemned, and the United States of America is an indispensable party to this action.

■ In the case of Carr v. United States, 98 U.S. 433, 25 L.Ed. 209, the court held:

"* * * We consider it to be a fundamental principle that the Government cannot be sued except by its own consent; and certainly no State can pass a law which would have any validity, for making the Government suable in its courts.

* * *" 98 U.S. at 437, 25 L.Ed. at 211.

It has been held to be elemental that the United States government is an indispensable party in an action against property in which the United States has an interest.

This principle of law was well set forth in the case of Public Utility District No. 1 of Pend Oreille County v. Inland Power & Light Company, 64 Wash.2d 122, 390 P.2d 690, and supporting authorities. We do not deem it necessary to add to the decisions cited therein. The property sought to be condemned was all of the electrical works, lines, plants, facilities, and electrical properties owned and operated by the Inland Power & Light Company, which, being a non-profit membership corporation organized under the laws of the State of Washington, was financed in its operation by the Rural Electrification Administration, an agency of the United States Department of Agriculture. The questions presented in Inland Power & Light Company, supra, are the same as in the instant case—that is, did the court lack jurisdic-

---

3. 1937 contract between the Salt River Valley Water Users Association and the Salt River Project Agricultural Improvement and Power District.

tion for the reason that the United States government was an indispensable party to the action? The court held:

"It is elemental that an action against property in which the United States has an interest is a suit against the United States. In United States v. Brosnan, 363 U.S. 237, 250, 80 S.Ct. 1108, 4 L.Ed.2d 1192 (1960), the court said:

"'* * * Under the decisions of this Court, a judicial proceeding against property in which the Government has an interest is a suit against the United States which cannot be maintained without its consent. The Siren, 7 Wall. 152, 19 L.Ed. 129; State of Minnesota v. United States, 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235; United States v. State of Alabama, 313 U.S. 274, 61 S.Ct. 1011, 85 L.Ed. 1327. It has been suggested that this principle applies only where the Government holds a fee interest or such other interest in the property as to render it an indispensable party under state law. See United States v. Cless, 3 Cir., 254 F.2d 590, 592. That, however, seems a dubious distinction since whether or not the United States is an indispensable party to a judicial proceeding cannot depend on state law. See State of Minnesota v. United States, supra, 305 U.S. at page 386, 59 S.Ct. at page 294, 83 L.Ed. 235.'

"It is urged that the United States (being fully aware of what is happening, it having appeared as amicus curiae in this court) may make an appearance in the condemnation proceeding at any stage it wishes.

"The rule of law is to the contrary.

"'* * * Where jurisdiction has not been conferred by Congress, no officer of the United States has power to give to any court jurisdiction of a suit against the United States. Compare Case v. Terrell, 11 Wall. 199, 202, 20 L.Ed. 134; Carr v. United States, 98

U.S. 433, 435–439, 25 L.Ed. 209; Finn v. United States, 123 U.S. 227, 232–233, 8 S.Ct. 82, 85, 31 L.Ed. 128; Stanley v. Schwalby, 162 U.S. 255, 270, 16 S.Ct. 754, 760, 40 L.Ed. 960; United States v. Garbutt Oil Co., 302 U.S. 528, 533–535, 58 S.Ct. 320, 323, 82 L.Ed. 405.' Minnesota v. United States, 305 U.S. 382, 388, 59 S.Ct. 292, 83 L.Ed. 235.

"This is not a new or novel doctrine. In United States v. Clarke, 8 Pet. 436, 33 U.S. 276, 281, 8 L.Ed. 1001 (1834), Chief Justice Marshall said:

"'As the United States are not suable of common right, the party who institutes such suit must bring his case within the authority of some act of congress, or the court cannot exercise jurisdiction over it. * * *'

"Authorities supporting the rule that the United States, as sovereign, is immune from suit save as it consents to be sued are collected in United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941).

"Counsel have not cited, nor have we been able to find, a federal statute authorizing REA, or anyone on its behalf, to consent to suit against property in which it has an interest." 390 P.2d at 692.

▮▮▮ It is plain that, as held in the Inland case, supra, mere submission of the appearance by the United States as an amicus curiae does not give the court jurisdiction. Nor is it contended that Congress has passed authorization for the United States to become a party to the action. In the instant case the question then is solely the interest of the United States government in the property sought to be condemned. Though this is an appeal from a summary judgment, all of the contracts were made a part of the record, and the determination of the issue turns upon the construction of these contracts and the provisions of the Reclamation Act and amendments thereto under which the Salt River Project was formed.

Section 10 of the contract dated June 25, 1904, between the United States and the Association, provides that:

"\* \* \* the rights of the members of the Association are to be defined and determined and enjoyed by and under the provisions of the said Act of Congress and of other Acts of Congress on the subject of the acquisition and enjoyment of the rights to use water, and by the laws of Arizona where not inconsistent therewith, where such rights have vested, modified, if modified at all, by the provisions of the Articles of Incorporation of said Association."

Prior to the contract dated September 6, 1917, all of the construction, operation and administration of the Project were conducted by the officers and employees of the United States government, under direction of the Secretary of the Interior. Under this contract the Association was designated by the United States as agent for the care, operation, and maintenance of Project facilities.

There were some 242,000 acres of land included in the Salt River Project. Soon after the Association took over the operation of the Project it became apparent there was not sufficient water for the irrigation of all of it, and it would be necessary to pump to prevent the waterlogging of the land, and for irrigation purposes. As a matter of fact, in the case of Hurley v. Abbott et al. (in the District Court of the Third Judicial District of the Territory of Arizona in and for Maricopa County, March 1, 1910), which decided the respective water rights of the members of the Association, Judge Edward Kent recognized the existence of a number of pumping plants for the supply of water during times of scarcity. Adams v. Salt River Valley Water Users' Association, 53 Ariz. 374, 89 P.2d 1060.

The pumping of this water required that the Association expand its electrical facilities. This court, in the case of Reichenberger v. Salt River Project Agricultural Improvement and Power District, 50 Ariz. 144, 70 P.2d 452, recognized the title in these facilities to be in the United States government, using the following language:

"It soon appeared that the complete developments of the waters of the Salt and Verde, together with the electric power which might be generated thereby, required additional works of an extensive character. The government declined to advance any further money for this purpose, but did permit the association to issue bonds and to cause these works to be constructed on its own account, the legal title thereto being held by the government, and an additional indebtedness of many million dollars was incurred by the association in this manner. \* \*" 50 Ariz. at 147, 70 P.2d at 453

In all of the contracts with the United States government, the government retained title to the property. The contract dated September 6, 1917, under which the Salt River Valley Water Users' Association took over the operation of the Project, did not vest title in the Association, but merely provided that:

"\* \* \* the United States agrees to and will \* \* \* turn over to and vest in the said Association, the care, operation and maintenance of the irrigations works known as the Salt River Project, situate in the counties of Gila, Pinal and Maricopa, consisting generally of the Roosevelt Dam, the Granite Reef Dam, irrigation canals, laterals and ditches, and other conduits, gates, pipes, power plants, power houses, buildings and other structures of every kind, transmission, telegraph and telephone lines, wires, pumps, machinery, tools and appliances and all property of whatsoever kind, real, personal or mixed, appurtenant to or used, or constructed or otherwise acquired to be used, in connection with the said Salt River Project, wheresoever said property may be situated, and as well, all water rights and franchises, and rights to the storage, diversion and use of water for irrigation or other purposes, water power, electric power and power privileges,

with such right of possession of all thereof, as shall be necessary or convenient for the care, operation and maintenance of said project by said Association, as hereinafter provided. * * *"

The contract also stated:

" * * * That it will make no substantial change in any of said works, without first having obtained the consent thereto, to be expressed in writing, of the Secretary of the Interior. * * *

* * * * * *

" * * * The Association agrees that all contracts which it may seek to execute for the sale or lease of power or power privileges covering a period of more than one year shall be subject to the approval of the Secretary of the Interior."

In setting forth the payments under the contract, it was provided that such payments would be paid "all without interest." The contract further provided:

"Fifteenth: The Association will in every practicable way cooperate with the Secretary of the Interior in carrying out the provisions of Section 2 of the act of Congress of May 19, 1916 (39 Stat., 130), providing for water rights for 631 Salt River Indian allotments of 10 acres each, and will cause to be performed such work as may be deemed necessary by the Secretary of the Interior to carry into effect the provisions of said law. The expense of such work will be met by the United States."

Paragraph nine provided that the contract could be cancelled or terminated upon March 1st of any year by giving one year's written notice thereof to the Secretary of the Interior, and that the agreement might be terminated by the United States government by written notice from the Secretary of the Interior, in case the Association failed to carry out the provisions of the law relating thereto or if the Secretary of the Interior should reasonably believe that the payment to it for the construction costs was being impaired by the failure or neglect of the Association to care for or maintain the Project.

The 1937 contract between the Salt River Valley Water Users' Association and the Salt River Project Agricultural Improvement and Power District specifically provided:

"WHEREAS, the Association, in furtherance of the objects for which it was incorporated, has expended or undertaken the payment of the following amounts for the construction by the United States or by the Association with the approval of the United States, upon the lands of the United States, without or within the boundaries of the Association, and for the equipment of storage dams, diversion dams, power plants, distribution and communication lines, roads, bridges, power and irrigation canals, laterals, ditches, pumping plants, pipe lines, and other properties and facilities, all of which are owned by the United States, * * *:

* * * * * *

"7. The District agrees that it will hold title to all properties conveyed or assigned to it under the provisions of Paragraph 2 of this Agreement, for the use and benefit of the United States, insofar as the United States may have an interest therein under the Reclamation Act and its amendments, and subject to disposition of such interest by order of the Secretary of the Interior of the United States, or other officer designated thereto by the Act of Congress known as the Reclamation Act, or acts amendatory thereof."

This contract was approved by the Secretary of the Interior on the express condition:

" * * * that the District agrees to accept title to the property conveyed subject to any and all provisions of all contracts between the United States and the Association and that the District will faithfully and promptly comply with any order directed to the Association by the United States pursuant to said contracts, and that any remedy available to the United States against the Association by virtue of the

contracts mentioned shall be enforceable against the District."

Plaintiff contends that the United States has no real interest in the subject matter of this condemnation. In its brief, it states:

"* * * The consideration for turning over of the works is that the Association shall pay to the United States the cost of construction and acquisition of the project promptly and without default, and sets up the times of payment. Without question, the entire original cost has now been repaid."

Plaintiff also states that since the construction cost has been paid, the only excuse for termination of the contract by the United States is if the Association fails to carry out the provisions of the law or of the agreement, but since the United States has been paid in full, plaintiff asks the question, "how can it longer claim any right to terminate?"

These are questions largely answered by the decision of the United States Supreme Court in the case of Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313, which specifically involved parts of two statutory enactments—one being Section 5 of the Reclamation Act of 1902 providing generally that no right to the use of water shall be sold for lands in excess of 160 acres to a single owner—and the other, Section 9 of the Reclamation Act of 1939 in regard to the repayment of the United States for funds expended on construction of reclamation works. The same question is raised in the instant case in regard to the interest of the United States in the Salt River Project after repayment. The U. S. Supreme Court, in the Ivanhoe case, supra, in speaking of the repayment provision, stated:

"The over-all allocation of these enormous costs has not been definitely determined. That portion of the costs ultimately allocated to power facilities will be reimbursed at 4% interest, but that allocated to irrigation facilities will be reimbursed at *no* interest. Moreover, the Federal Government will receive no reimbursement for that portion of the cost allocated to numerous aspects of the project, such as navigation, flood control, salinity prevention, fish and wild life preservation, and recreation. The irrigators will, therefore, be chargeable with but a small fraction of the total cost of the project." 357 U.S. at 283, 78 S.Ct. at 1179, 2 L.Ed.2d at 1321

* * * * * *

"VI. THE CONSTITUTIONAL ISSUES.

"Appellees urge, however, that the federal statutes requiring insertion of these provisions in the contracts are unconstitutional as a denial of due process and equal protection of the law under the Fifth and Fourteenth Amendments. They assert that the excess acreage provisions amount to a taking of vested property rights both in land and irrigation district water, and discriminate between the nonexcess and the excess landowner. We cannot agree.

"There can be no doubt of the Federal Government's general authority to establish and execute the Central Valley and Santa Barbara County projects. As we said in United States v. Gerlach Live Stock Co. [339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231, 20 A.L.R.2d 633,] supra, the Congress 'elected to treat it [the Central Valley Project] as a reclamation project.' 339 U.S. at 739, 70 S.Ct. [955] at page 962. We upheld its power to pursue the project as 'clear' and 'ample,' an exercise of the general power 'to promote the general welfare through large-scale projects for reclamation, irrigation or other internal improvement.' Id. 339 U.S. at page 738, 70 S.Ct. [955] at page 962. The Santa Barbara Project is supportable on the same grounds. Cf. United States v. Butler, 1936, 297 U.S. 1, 65–67, 56 S.Ct. 312, 80 L.Ed. 477, 488, 489 [102 A.L.R. 914]. In *developing these projects the United States is expending federal funds and acquiring federal property for a valid public and national purpose, the promotion of agriculture.*

*This power flows not only from the General Welfare Clause of Art I, § 8, of the Constitution, but also from Art IV, § 3, relating to the management and disposal of federal property. As this Court said in United States v. City and County of San Francisco, 1940, 310 U.S. 16, 29–30, 60 S.Ct. 749, 756, 84 L.Ed. 1050 [1059], 1060 this 'power over the public land thus entrusted to Congress is without limitations. "And it is not for the courts to say how that trust shall be administered. That is for Congress to determine."'* [Emphasis supplied] "See also United States v. State of California, 332 U.S. 19, 27, 67 S.Ct. 1658, 91 L.Ed. 1889, 1893 (1947), and State of Alabama v. State of Texas, 347 U.S. 272–274, 74 S.Ct. 481, 98 L.Ed. 689, 693, 694 (1954).

"Also beyond challenge is the power of the Federal Government to impose reasonable conditions on the use of federal funds, federal property, and federal privileges. See Berman v. Parker, 1954, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27, and Federal Power Comm. v. Idaho Power Co., 1952, 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15. The lesson of these cases is that the Federal Government may establish and impose reasonable conditions relevant to federal interest in the project and to the over-all objectives thereof. Conversely, a State cannot compel use of federal property on terms other than those prescribed or authorized by Congress. Public Utilities Comm. of State of California v. United States, 1958, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470. Article VI of the Constitution, of course, forbids state encroachment on the supremacy of federal legislative action.

"In considering appellees' specific constitutional contentions, it is well to recapitulate. The Central Valley Project is multi-purpose in nature. That portion of the project expense attributable to navigation, flood control, salinity prevention, recreation and fish and wildlife preservation is nonreimbursable. The remainder of the total expense, and the only part that is reimbursable, is divided between two main sources. The first is hydroelectric power which estimates indicate will be chargeable with over 50 percent of the reimbursable expense, plus interest on the part representing electric plants in service. *The other is irrigation, which pays the rest without interest charge. In short, the project is a subsidy, the cost of which will never be recovered in full.*" [Emphasis supplied] "Appellees argue that the same reasoning applies to power facilities, but there the Government is operating the generating facilities itself and the base rate upon which the power is sold includes an item for interest on the amount of expenditures allocated to that purpose. Hence the true relationship of debtor-creditor is maintained. In the light of these facts we believe that the language of the Court in Wickard v. Filburn, 1942, 317 U.S. 111, 131, 63 S.Ct. 82, 92, 87 L.Ed. 122, [138] is apposite: 'It is hardly lack of due process for the Government to regulate that which it subsidizes.'

\*   \*   \*   \*   \*   \*

"Second, objection was made to the absence of any provision to the effect that the districts would obtain title to the distribution systems when their obligations therefor had been totally discharged. We do not understand appellees to contend that the districts and landowners should ultimately obtain title to the principal dams and reservoirs. The fact that irrigation interests are bearing but a small fraction of the cost of the water supply facilities renders such a suggestion untenable. For related reasons we see no defect in the failure to guarantee passage of title to the local distributing systems at the end of 40 years when it is contemplated that the obligation therefor shall have been discharged. As we have pointed out, even the terms regarding the distribution systems involve a substantial federal subsidy because no interest is charged over the 40-year period during which the principal amount is repaid.

In reality, the districts will *never* repay the total cost of the systems." 357 U.S. at 294, 78 S.Ct. at 1185, 2 L.Ed. at 1327

As pointed out in Ivanhoe, supra, the irrigation features of federal irrigation projects are built without the payment of interest. This is true in the instant case; thus, in reality, the cost has never been and will never be fully repaid. The United States is interested in seeing that the District fulfills its obligation as set forth in paragraph 15 of the 1917 contract in regard to providing for water for the Salt River Indian allotments, in the enforcement of the 160-acre limitation per person, and the fulfillment of other provisions of the contracts.

As stated in these cases, the Reclamation Act was passed for the benefit of the people to develop the arid lands of the West. The people trying to develop this great Salt River Valley of Arizona—just as in the Central Valley in California—found it necessary to call upon the United States government for help, and, as the United States Supreme Court said in the Ivanhoe case, supra, the power of the Federal Government to impose reasonable conditions upon the use of federal funds, federal property, and federal privileges is beyond challenge.

The initial money for the construction of this project was put up by the Federal Government. Without this initial investment the expansion would not have been possible. The initial investment gave the Project the financial standing necessary to secure loans. For example, payment of bonds issued for construction of dams below Theodore Roosevelt Dam was made possible by the sale of electricity generated at such dams, because Theodore Roosevelt Dam stored water which could be let down for the generation of electricity. The sale of this additional electricity, however, depended on an expansion of the market. It is an integrated project, the success of one phase depending on the others. It

was evidently for this reason that in the 1917 contract the Association was required to agree to the provision: "That it will make no substantial change in any of said works, without first having obtained the consent thereto, to be expressed in writing, of the Secretary of the Interior. * * *" Plaintiff points to the further provision in the same paragraph which permits the District to construct additional works at its own cost without the necessity of procuring the assent of the Secretary of the Interior, provided that such additional works shall not in any wise impair or diminish the present efficiency or adequacy of the project for the purposes for which it has been designed, constructed and acquired, as supporting its contentions that the United States government did not thereby gain an interest in the property sought to be condemned in the instant case. This is not the interpretation as represented to Congress first in 1922 by Carl Hayden in securing the passage of the bill to permit the sale of surplus power on the Salt River Reclamation Project. Senator Hayden, then Congressman, in a report from the Committee on Irrigation of Arid Lands [4], stated:

"Under our contract with the Government any new development or extension of our present power system automatically becomes the property of the United States Government; to be operated for the benefit of the project it is true, but nevertheless the title will always remain in the United States Government. Furthermore, the Government now has a prior lien on this project of over $9,000,000. This makes the financing of this new development a difficult proposition by any of the usual methods. Direct assessment on the farmers of this valley for this development would be useless to consider at this time."

The same representation was made to the Senate in the report of the Committee on Irrigation and Reclamation by Senator Cameron.[5] This has also been the inter-

4. Report No. 1000, 67th Congress, 2d Session, House of Representatives.

5. Senate Report No. 826, 67th Congress, 2d Session.

pretation of this court in the case of Reichenberger v. Salt River Project Agricultural Improvement and Power District, supra. This same interpretation was recognized in the recent case of Uhlmann v. Wren, supra, in which it was pointed out that our Legislature had also recognized the interest of the Federal Government in this project.

"Section 5 of the Act (now codified as A.R.S. § 45–2163, subsec. D) provides that the District's powers in a contract with the Federal Government include the following:

" 'That by any such contract or agreement, the district may agree that the Federal Government, or any such public or private agency, or corporation, may assume or may liquidate, compromise, pay or discharge, all or any part of the indebtedness of the district; may agree that the stock or other evidence of the ownership or interest of the district in any such private corporation or agency, *as well as any other properties of the district, may be placed or held in trust irrevocably* during the term of such contract or agreement or for such other period as may be prescribed in such contract; * * *.'

"Thus, this legislation shows that in 1934 the Legislature was aware that the Federal Government might have an interest in District property as a result of contract. Two years later, in 1936, the Legislature enacted § 8, Chapter 10, Laws of 1936, 1st S.S. (now codified as A.R.S. § 45–940, subsec. B), which provides in pertinent part as follows:

" 'The board * * * shall also have the right and power, for and in the name of and for the use and benefit of the district, *to exercise the right of eminent domain* and thereby take, hold and possess any and all such land and other property as may be necessary for the construction, use, maintenance, repair, improvement or extensions of

any works necessary or useful for the purposes of the district.'

"Having empowered the District in 1934 to make contracts with the Federal Government whereby the latter would have an interest in District property, the Legislature was aware in 1936 that property taken under the power of eminent domain which it was then authorizing would also be subject to a possible Federal interest. This sequence of legislation clearly demonstrates that the Legisture did not intend to render nugatory the power of eminent domain which it was granting because two years earlier it had authorized the District to place its properties in trust for the Federal Government." 97 Ariz. at 384, 401 P.2d at 125.

Plaintiff states that the representation of the United States that the faciliies are located on a general perpetual right-of-way easement granted in the landowners' contract for inclusion of their lands in the Project is not factual, in that it contradicts the wording of the easement attached on the Representation of Interest which was executed the 27th day of May, 1958. This easement was one granted in the contract of the landowners for inclusion of their lands in the Project.

It is immaterial as to how the Project secured these easements, as was recognized in the case of City of Mesa v. Salt River Project Agricultural Improvement and Power District, supra, in which we stated:

" * * * The legislature has granted to the District without restriction the right to sell power and the District has acted upon this grant by extending its distributing system so as to meet the reasonable needs of those inhabiting the disputed areas. Whether in so doing the District used the public roads of the state and county, private ways, easements asserted to arise out of the water right applications or a combination thereof is not material to the decision here. A large investment has been made in gener-

ating equipment and the various works necessary to supply power to consumers.

*   *   *   *   *   *

"If the public roads of the state ·or any of its political subdivisions have been used by the District in the operation of its distribution system, consent to such must necessarily be implied from the fact thereof. The District may not be ousted from the use of the public ways once having accepted by acting on the grant of the state. City of Seattle v. Western Union Telegraph Co., 21 Wash. 2d 838, 153 P.2d 859; cf. Traverse City v. Consumers Power Co., 340 Mich. 85, 64 N.W.2d 894; Southern Bell Telephone & Tel. Co. v. City of Meridian, 241 Miss. 678, 131 So.2d 666." 92 Ariz. at 99, 373 P.2d at 728.

Under the interpretation which has been placed upon the contracts with the United States government by this court, property acquired by the District in the extension of the Project's electrical plant and distribution system is held in trust for the United States. The basis of the amendment to the Reclamation Act to permit the sale of power by the Project was, as stated by Carl Hayden, then Congressman, " * * * any new development or extension of our present power system automatically becomes the property of the United States Government; * * *." Senator Hayden pointed out at the time (1922) that this amendment was passed to permit the Project to finance this additional development.

The Reichenberger case, supra, in speaking of additional electrical works of an extension character which were to be paid for by bonds of the Project, also stated " * * * the legal title thereto being held by the government, * * *" At no place in the contracts, or in the interpretation of the contracts is it recognized or provided that any part of the Project's electrical plant or distribution system would be held other than in trust for the Federal Government.

This case only involves the jurisdiction of the state courts when the United States government has an interest in property sought to be condemned. We have recognized the right of the Project to bring suit and they have brought suit in many other instances.

We do not pass upon what the United States government should do in regard to the title to these various projects, for as stated in the Ivanhoe case, supra, this is a matter to be determined by the Federal Government and not by this court. Plaintiff is not without remedy, but its remedy does not lie in this court. We find the United States of America has an interest in the property sought to be condemned, and is an indispensable party to the action. We therefore hold the lower court did not have jurisdiction over the action.

Judgment affirmed.

STRUCKMEYER, C. J., BERNSTEIN, V. C. J., and UDALL, J., concur.

NOTE: Justice LORNA E. LOCKWOOD did not participate in the determination of this appeal.